Filed 5/24/13  P. v. Tovar CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JUAN LUIS TOVAR,<br><br>      Defendant and Appellant. | A134785<br><br>(Sonoma County<br>Super. Ct. No. SCR597955) |

Defendant pleaded no contest to felony possession of a shotgun (former Pen. Code, § 12021, subd. (e))[1] and misdemeanor participation in a criminal street gang (§ 186.22, subd. (a)),[2] and was placed on probation for three years with gang conditions. This timely appeal, challenging the denial of his motion to suppress pursuant to section 1538.5, followed.  We affirm.

### I. Facts

At approximately 1:00 p.m. on February 17, 2011, William Halliday, the principal of a local continuation school, called Santa Rosa Police Sergeant Rainer Navarro of the Gang Crimes Team, to report an incident involving defendant.  Halliday related that shortly after his students were released for lunch, he noticed a group of known Sureño gang member students, standing near a corner just south of the school.  A gold-colored sedan drove into the area, stopped and parked.  Halliday recognized the occupants as

---

[1] All further statutory references are to the Penal Code.

[2] A charge of unlawful possession of ammunition (former § 12316, subd. (b)(1)) was dismissed.

1

defendant and his younger brother R. The brothers both got out of their vehicle and defendant opened the trunk and removed an object, which he placed near the front of his waistband. Fearing an altercation was imminent, Halliday honked his horn and yelled at the Tovar brothers to leave. The Tovars got back into their vehicle and drove away.

Sergeant Navarro relayed the information to Detective Kyle Philp of the Gang Crimes Team. Detective Philp knew the Tovar brothers by name and appearance; he searched their criminal records for more information. Philp determined that defendant had a 2006 juvenile adjudication of misdemeanor section 245, subdivision (a)(1), which resulted in his being prohibited from possessing a firearm until age 30. Defendant was a well-known Norteño gang member and rap artist. Defendant's brother R. was a validated Norteño gang member and was on juvenile court probation, with a full search and seizure condition covering his whole residence, as well as his person and vehicle.

The officers watched the Tovars' residence (an apartment on Kenton Court) until they observed defendant, a woman later identified as his wife, and R. leave the apartment and drive away in a gold 2004 Chevrolet Impala. Detective John Cregan followed the vehicle and advised other officers that R. was in it. Pursuant to R.'s search clause, patrol officers stopped the vehicle, driven by defendant, some distance from the apartment. The three occupants were removed from the car and detained, and keys to the apartment were seized. Detective Cregan arrived at the scene of the vehicle stop as Detective Philp arranged for all three occupants to be transported to the police station for questioning. Philp gave the apartment keys to Detective Cregan, but remained at the scene of the vehicle stop. Detective Cregan and four other officers conducted a probation search of the residence.

Upon entry into the apartment, the officers conducted a protective sweep. The Tovar brothers had been reported to have been engaged in activity that indicated they had a weapon. In Detective Cregan's experience, other gang participants are often inside or near gang premises and may pose a risk due to their concern that the police may find prohibited weapons, narcotics, or gang indicia. While conducting the protective sweep, Detective Cregan entered the west bedroom, and immediately saw a black pistol-grip

shotgun in plain view (the gun lay partially underneath a bed). Two boxes of ammunition were on a nearby nightstand. After securing the apartment, the police conducted a complete search and located indicia relating to defendant in the west bedroom.

During an interview at the police station, R. indicated that he slept on the couch in the living room and that defendant and his wife slept in the west bedroom. This information was transmitted to Detective Cregan, but he believed it was after the search was conducted. Defendant informed police that he purchased the gun from Sportsman's Arms in Petaluma (the next day he provided a receipt for the purchase of the gun to Detective Philp). Defendant indicated that he usually kept the gun in his bedroom with a lock on it.

## II. Discussion

### A. Standard of Review

On appeal from a trial court's denial of a motion to suppress, we defer to the trial court's factual findings, whether express or implied, if they are supported by substantial evidence. We exercise our independent judgment as to whether, on the facts so determined, the search or seizure was reasonable under the Fourth Amendment to the United States Constitution (Fourth Amendment). If the facts are undisputed, we independently determine the constitutionality of the challenged police conduct. (*People v.* Celis (2004) 33 Cal.4th 667, 679; *People v. Rangel* (2012) 206 Cal.App.4th 1310, 1315.)

### B. Defendant's Initial Detention

Defendant challenges the legality of his detention in the field, arguing that it was not supported by a reasonable suspicion that he had committed or was about to commit a crime. Initially, it must be noted that the vehicle in which defendant and his brother R. were riding was legally detained, pursuant to R.'s probationary search clause.[3] That

---

[3] Had the police detained the vehicle and its occupants at the apartment where the probation search was to be conducted, even an otherwise suspicionless detention would have been justified for officer safety, so long as it was in the "immediate vicinity" of the residence being searched. *Bailey v. United States* (2013) 568 U.S. ___ [185 L.Ed.2d 19].

probation condition required, among other things, that R. submit to the warrantless seizure of his person at any time of day or night. No further justification was needed for defendant's detention. The initial detention of the driver and occupants of a vehicle continues, and remains reasonable, for the duration of the stop. (*Arizona v. Johnson* (2009) 555 U.S. 323, 333.) Here, R.'s search clause permitted not only the seizure of the vehicle, but also its search, and the continuing detention of the car's occupants while that search was conducted was reasonable. (*See Muehler v. Mena* (2005) 544 U.S. 93, 98; *Michigan v. Summers* (1981) 452 U.S. 692, 705 [detention of occupants of residence during execution of search warrant reasonable].)

Even assuming the detention of defendant required a reasonable suspicion of his involvement in criminal activity, that suspicion was amply demonstrated under the facts. Halliday, the school principal, had relayed information to the police that established that defendant and his brother, both Norteño gang members, were seen stopping in close proximity to a group of Soreño gang members, defendant got out of the car, retrieved an object from the trunk, and placed it in the area of his waistband. One could reasonably infer that the retrieved item was a weapon. Had it not been for Halliday's quick intervention, a much more serious altercation would likely have ensued. The officers, upon receiving this information, checked both of the brothers' criminal records and found that defendant had a prior adjudication for misdemeanor section 245, subdivision (a)(1), which resulted in a prohibition against him possessing a firearm until age 30. The vehicle, that the officers observed defendant, his wife, and his brother drive away from the residence in, matched the description of the vehicle given by Halliday. Under the totality of the circumstances, the officers had a reasonable suspicion that criminal activity was afoot, and that the defendant was involved in it. (*People v. Souza* (1994) 9 Cal.4th 224, 230.) Nothing more is required.

## C. Transporting Defendant to the Police Station

At some point after the initial detention of the vehicle, defendant and the other two occupants were transported to the police station for questioning. Once there, defendant was advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), and

4

questioned. During this questioning, he admitted that the shotgun found in the residence was his. Defendant now contends that his transportation to the police station and subsequent questioning constituted a de facto arrest, requiring probable cause that he committed a specific crime, and that his statement is fruit of the illegal arrest. His contention that he was subjected to a de facto arrest without probable cause has merit, although we find that his statement is, nevertheless, admissible.

The United States Supreme Court has held that transporting suspects to the police station, advising them of their rights, and interrogating them may amount to a de facto arrest. (*Dunaway v. New York* (1979) 442 U.S. 200, 212; *Kaupp v. Texas* (2003) 538 U.S. 626, 630.) The Attorney General does not dispute that defendant's transportation to the police station and subsequent questioning amounted to a de facto arrest, instead arguing that defendant forfeited this claim, and that the action of the police was supported by probable cause, in any event.

We do not agree that defendant has forfeited this claim, although his assertion of it below could have been much clearer. As noted by the Attorney General, defendant's moving papers in the trial court simply asserted that he was subjected to a warrantless seizure. However, in arguing the motion below, defense counsel did state, "[t]here was no reason to keep him there at the car, *to transport him to the station*, to interview him further . . . ." (Italics added.) Defense counsel went on to conclude her remarks by arguing that defendant's statement was fruit of the poisonous tree of his illegal *detention* (not mentioning de facto arrest). However, under all the circumstances, we find that the prosecution and court were on sufficient notice that defendant was arguing that his transportation to the police station was not reasonable—that it was a warrantless seizure that violated the Fourth Amendment. Similarly, defense counsel's failure to object when the trial court did not specifically rule on whether or not defendant's transportation to the police station and questioning constituted a de facto arrest unsupported by probable cause does not forfeit the issue. The "claim" or basis of the motion was that defendant was subjected to an illegal seizure; the trial court ruled upon that motion by denying it. The Attorney General cites no authority for the proposition that defendant was required to

5

seek a separate and distinct ruling on each individual argument made, or theory relied upon, during the motion in order to preserve the issue on appeal.

Defendant's de facto arrest must have been supported by probable cause in order to be reasonable under the Fourth Amendment.  Probable cause is a fair probability—"when the facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime.  [Citations.]"  (*People v. Price* (1991) 1 Cal.4th 324, 410.)  In the present case, if the shotgun had already been located in defendant's bedroom, that would certainly have provided the sufficient probable cause to support the de facto arrest occasioned by defendant's transport to the police station and subsequent questioning.  The record, however, is unclear on the timing of the events.

Detective Philp testified that patrol officers stopped the vehicle, that defendant, his wife, and his brother R. were removed from the car, and that he "asked that all three of them be transported to the police department so that they could be interviewed."  As transportation for everyone back to the station was being arranged, Detective Cregan arrived on the scene and obtained the keys to the residence where the shotgun was located.  Philp additionally indicated that "as we were transporting them to the station, we were discussing whether or not we were going to go back to the residence to search it and it was decided that we would."  He did not communicate further with the officers

searching the residence until he was done with an interview (with an unidentified subject) that he conducted at the police station; he then found out how the search went.[4]

The burden was on the prosecution, of course, to prove the reasonableness of this warrantless seizure of defendant. Assuming, therefore, that the shotgun was not located until after defendant was transported to the police station, probable cause did not develop until some point in time after he arrived there.[5] However, we find persuasive the Attorney General's argument that defendant's statement would inevitably have been discovered by lawful means, even if it technically was obtained at a point in time prior to the development of probable cause. The evidence surrounding the specific timing and sequence of events was at best ambiguous, but it appears that defendant and the others were transported to the police station at approximately the same time that other officers responded to the residence and searched it. The shotgun was discovered fairly early on after entry into the apartment, during the initial protective sweep of the residence, which took approximately three to five minutes after entry. Indicia linking defendant

---

[4] Indicative of the lack of specificity regarding the time sequence, at the preliminary hearing in this matter (held on May 26, 2011), Detective Philp testified that he "was at the location where we stopped the vehicle Juan Tovar and [R.][T.] were in," when Detective Cregan was performing the search of the residence. Detective Cregan informed Philp that they had located a shotgun, shells, and indicia for defendant in a bedroom. Philp later questioned defendant about the shotgun, after defendant and the others were transported to the police station. The exact sequence of these events was not specifically elaborated upon but, in any event, it does not appear that defendant made a motion to suppress at the preliminary hearing. The motion to suppress was made at a special hearing after the information had been filed, held in conjunction with a preliminary hearing in another docket.

[5] Respondent argues that the officers had probable cause to arrest defendant for unlawful participation in a criminal street gang (§ 186.22, subd. (a)), based upon the information received from Halliday regarding the interrupted confrontation near the school, along with the officers' knowledge of the Tovar brothers' involvement in the Norteños. However, as defendant points out, a violation of that section requires that the individual promotes, furthers, or assists felonious criminal conduct by members of a gang. While the information from Halliday provided the required reasonable suspicion that some criminal activity was afoot, it did not amount to full blown probable cause that a felony was being committed.

7

specifically to the bedroom where the shotgun was discovered was located shortly thereafter. This evidence was discovered before defendant was interviewed at the police station and made incriminating statements about the gun, which he argues are fruit of the poisonous tree of his de facto arrest without probable cause.

His statement, inevitably, would have been elicited by lawful means, as probable cause for his arrest developed, at the latest, fairly soon after defendant was transported to the police station. Indeed, probable cause to arrest defendant (based upon discovery of the shotgun, ammunition and indicia) existed at the time his statement admitting ownership of the firearm was made. As the court explained in *People v. Robles* (2000) 23 Cal.4th 789, 800, "Under the inevitable discovery doctrine, illegally seized evidence may be used where it would have been discovered by the police through lawful means. . . . The purpose of the inevitable discovery rule is to prevent the setting aside of convictions that would have been obtained without police misconduct." [6]

**D. Search of the Residence**

Detective Cregan and other officers responded to the Tovars' residence to conduct a probation search. A provision of R.T.'s probation required that he submit to a warrantless search of his person or property at any time of day or night, and specifically to a search of his *whole residence* any time of day or reasonable hour of night by any law enforcement officer. Prior to conducting the search, Detective Cregan knew that R. and defendant lived at the residence, and assumed that their parents resided there as well. He did not believe that he learned of defendant's wife living there until after he entered the residence. While conducting an initial sweep of the apartment, Cregan observed a shotgun in plain view in the west bedroom, and also discovered ammunition. Later, during a full probation search, indicia belonging to defendant was located on the dresser in that room. Sometime after the search, he learned that R. had told other officers that he, in fact, slept on a couch in the living room. Defendant does not challenge the initial entry into the residence to conduct a lawful probation search. He does, however, contend that

---

[6] Notably, defendant returned to the police station the next day and supplied the police with a receipt for the gun, independently proving his ownership of the weapon.

the entry into and subsequent search of the west bedroom, later determined to be where defendant and his wife slept, was not authorized under R.'s probation search clause, and that the initial entry into that room could not be justified as a protective sweep. We disagree.

First, the officers were justified in doing a protective sweep of the apartment prior to conducting the probation search, pursuant to *Maryland v. Buie* (1990) 494 U.S. 325, 335–336 (*Buie*). Although *Buie* specifically involved a lawful entry into a residence by the police to arrest, *Buie* may also apply when officers are lawfully on the premises to conduct a probation search. As Division Five of this court explained, in order to conduct a protective sweep in this type of situation, the officers must have a reasonable suspicion that the area to be swept harbors an individual posing a danger. (*People v. Ledesma* (2003) 106 Cal.App.4th 857, 863 (*Ledesma*).) Courts must evaluate this issue based upon a totality of the circumstances, including the experience and specialized training of the officers. (*Ibid.*) Courts are to avoid "unrealistic second-guessing" of officers acting in swiftly developing situations. (*Id*. at p. 864.) The type and location of the conduct the officers contemplate taking after the sweep are relevant factors; conducting a thorough probation search would increase the officers' concern, as well as the fact that the search was going to occur on their " 'adversary's "turf," ' " as well as the distraction of conducting a careful examination of "all the nooks and crannies of a probationer's bedroom." (*Ibid*.) While a protective sweep is not always justified, "a prudent officer will consider the safety concerns triggered by a search in determining the appropriateness of first conducting a sweep and a reviewing court must do the same." (*Id.* at pp. 864–865.)

Given this legal backdrop, the facts in the present case, viewed in light of the officers' training and experience, justified conducting a protective sweep of the apartment before conducting the probation search. Detective Cregan testified that they were unsure if someone else was in the apartment at the time they entered, and that it had been his experience in conducting probation searches that individuals were hiding in closets, under clothes, under beds, under mattresses, in attics, and in garages. He indicated that it was

9

common that after police knock and announce, and do not hear anyone, they find someone inside a residence, quietly waiting for the officers to go away. Further, Cregan said that in his experience, other gang members are often either at the home of an investigated gang member or loitering in the area, and those gang members show increased desire for flight and fight when they have something in the house that they may be prohibited from owning or possessing, such as weapons, drugs, or gang-related indicia. Detective Cregan was very experienced in gang investigations, having investigated those types of crimes exclusively for the last three years, having investigated hundreds of gang cases, and having done probation and parole searches of gang members on a regular basis. The officers here were working under facts that would have made a reasonable officer especially concerned about conducting a probation search. Both defendant and the probationer were known members of the Norteños, and had been involved in a recent incident where it appeared that defendant was armed. While the officers had detained the Tovar brothers, and defendant's wife, they surmised that other individuals might reside at the apartment.

In *Ledesma*, the court recognized that "[f]irearms are, of course, one of the ' "tools of the trade" ' of the narcotics business," and relied upon that recognition in finding that a protective sweep of a residence that was reasonably concluded to be the site of ongoing narcotics activity was permissible. (*Ledesma*, *supra*, 106 Cal.App.4th at p. 865.) Firearms are, certainly, one of the "tools of the trade" of gangs. This, coupled with their belief that others resided at the apartment, gave the officers the required reasonable suspicion that justified a limited protective sweep of the premises before conducting the probation search.

Additionally, the officers were justified in entering the west bedroom pursuant to R.'s probation search clause. "In California, a person may validly consent in advance to warrantless searches and seizures in exchange for the opportunity to avoid serving a state prison term. [Citations.]" (*Robles, supra,* 23 Cal.4th at p. 795.) Under the "common authority" theory of consent, if an individual lives with a probationer, shared areas of their residence may be searched under the probation search clause. (*Id.* at pp. 795–796.)

10

A search pursuant to a probation search clause may not exceed the scope of the clause relied upon. "Moreover, officers generally may only search those portions of the residence they reasonably believe the probationer has complete or joint control over. [Citation.]" (*People v. Woods* (1999) 21 Cal.4th 668, 682.)

Here, the particular search clause was broad and purported to permit the warrantless search of R.'s entire residence. We agree with defendant that the scope of the search that might be conducted even pursuant to such a broad search clause is limited to those portions of the residence that the officers reasonably believe the probationer has either complete or joint control over. Bearing in mind that, " '[t]hose associating with a probationer assume the ongoing risk that their property and effects in common or shared areas of a residence may be subject to search' " (*People v. Smith* (2002) 95 Cal.App.4th 912, 919), the search of what later turned out to be a bedroom that defendant and his wife slept in was reasonably searched by the officers, pursuant to R.'s probation search clause.

As the trial court found, the living situation in the home was ambiguous, and "[t]here was no clear room identified for Mr. [R.][T.]." Although the testimony established that R. slept on the couch, this would not have been apparent to the officers when they entered the apartment. There were two bedrooms, but there were at least three sets of parties that might have used any of these rooms. Even though defense counsel argued that pictures on the wall in the room identified the west bedroom as defendant's, this was not clear to the court, as the pictures could have been put up by R. As also noted by the court, the officers did not uncover "anything to indicate that the room in which the gun was found was Juan's room based on their search until they found specific indicia that the room was Juan's room." Because no information in the possession of the officers at the time the search was conducted indicated that the bedroom where the gun and ammunition was found was exclusively occupied by defendant, the police could reasonably conclude that the west bedroom was an area that the probationer at least had joint access or control over. The search of this bedroom was, therefore, valid under R.'s probation search clause. The motion to suppress the items found in the residence was properly denied.

## III. Disposition

The judgment is affirmed.

_____
Sepulveda, J.*

We concur:

_____
Margulies, Acting P.J.

_____
Dondero, J.

* Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.