[No. A097337. First Dist., Div. Five. Feb. 28, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL GREGORY LEDESMA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, part II. of this opinion is not certified for publication.

## Counsel

Mark T. Clausen for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, René A. Chacón and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**SIMONS, J.**—When conducting a search or an arrest in a home, police officers face the potential danger posed by unknown persons located inside. In *Maryland v. Buie* (1990) 494 U.S. 325 [110 S.Ct. 1093, 108 L.Ed.2d 276] (*Buie*), the United States Supreme Court formulated the standard for determining when police are entitled to conduct a brief, cursory sweep of the premises for such persons before undertaking an arrest. In this case, we revisit *Buie* and apply it to a protective sweep conducted prior to a valid probation search. During the sweep, the officers discovered a substantial quantity of money and controlled substances in a bedroom they would have been unable to enter during the probation search. Defendant Michael Gregory Ledesma was not the subject of the probation search, but occupied the bedroom where the money and drugs were found. After unsuccessfully moving to suppress this evidence, he entered no contest pleas to two counts of possession for sale of a controlled substance. Defendant now appeals the trial court's ruling denying suppression. We conclude that the particular facts known to the officers, when evaluated in light of their training and experience, justified the protective sweep, and we affirm.

### Background

We rely on the facts developed at the hearing on defendant's motion to suppress evidence (Pen. Code, § 1538.5). On February 20, 2001, while

engaged in the narcotics arrest of a third person, Napa Police Officer Doug Rosin contacted Cindy Barajas, whom he knew to be a twice-convicted drug user on probation with a search and seizure condition. In response to a question from Rosin, Barajas provided her current address in Napa (hereafter the 2414 residence). Rosin confirmed this information with the Napa County Sheriff's Department records division,[1] and then transported Barajas to that address in order to conduct a probation search. She approached the 2414 residence and attempted to enter through the front door, which was locked. She pointed through the front window to a set of keys hanging inside and stated that the keys were probably hers. Since they were unable to enter, Barajas was returned to the place where she was first contacted.

The next afternoon, Officers Rosin and Farrow returned to the 2414 residence to complete the probation search. Rosin noted two cars parked in front of the residence and a trailer parked in the driveway. Defendant responded to the officers' knock and admitted them into the residence. Rosin believed that defendant was under the influence of drugs. ██ ██ After the officers informed him of their reason for being there, defendant replied that Barajas was not there, did not always stay at the 2414 residence, and had not been there in a while.[2] Defendant then escorted the officers to the northeast bedroom used by Barajas when she was at home. Before beginning their search of that bedroom, Rosin asked defendant if anyone else was in the residence, and he responded in the negative. Rosin informed defendant that he wished to do "a security check for [the officers'] safety" to "make sure nobody was going to sneak up behind [them] while [they] had [their] heads buried in a dresser drawer looking for items within [Barajas's] probation terms." Defendant then escorted the officers to the northwest bedroom, which belonged to him. Rosin looked on the bed, to the right of the bed and inside an open closet. He noticed defendant walk up to a wooden dresser in the room, grab what appeared to him to be several bindles of methamphetamine and slide them into the dresser drawer. Rosin also observed a roll of money on the dresser top and formed the opinion, based on the large sum of money and the large quantity of methamphetamine, that defendant was selling controlled substances. He asked if the

---

[1]The records division informed Rosin that Barajas was on probation in two cases and each probation order listed the 2414 residence as her address. In fact, one of the probation orders listed her address as the trailer in front of the 2414 residence, but Rosin was unaware of this.

[2]Defendant appears to argue that the probation search itself was invalid, because the police lacked probable cause to believe Barajas lived at the 2414 residence once defendant denied she was living there. We believe this misstates the defendant's comments about Barajas. In any event, even if accurate, it would be unavailing. Barajas had not only verbally informed the officers that she lived at the 2414 residence, but had actually brought them to the residence and attempted to enter it the night before the probation search. Further, the officers had verified the 2414 residence address with the records division. No matter how vociferously defendant had denied her occupancy, the officers would have been entitled to pursue the search.

substance defendant had hidden in the drawer was "crank," and defendant responded that it was. Rosin arrested defendant for possession of the methamphetamine and, with defendant's consent, thoroughly searched the bedroom, finding more than an ounce of controlled substance and other evidence suggestive of drug trafficking.

During the hearing, Rosin set out his training and experience in the narcotics field. He had worked with the Napa County Narcotics Task Force for two years and received "countless" hours of training in connection with that position. He had also testified in court "in different drug related fields."

In April 2000, a felony information was filed charging defendant with possession of methamphetamine with the intent to sell (Health & Saf. Code, § 11378) and possession of cocaine with the intent to sell (Health & Saf. Code, § 11351). On August 20, 2001, the court heard and denied defendant's motion to suppress evidence. Defendant moved for reconsideration and, on November 8, 2001, the court reaffirmed its previous ruling. On that same date, the defendant entered pleas of no contest to both charges and was ultimately sentenced to state prison for three years on one charge with a concurrent two-year sentence for the other. The court granted bail pending appeal based upon defendant accepting both a search and seizure and a chemical testing condition. Defendant consented to both conditions.

In this appeal, defendant challenges the court's ruling on the suppression motion, arguing that the security search of the residence that led to the discovery of the controlled substances and related evidence was unjustified. He further contends that the trial court erred by imposing a search and seizure clause as a condition of bail pending appeal. We disagree with each contention.

DISCUSSION

I. *The Protective Sweep*

■ On appeal from a motion to suppress evidence, all presumptions are in favor of the trial court's factual findings, whether express or implied, where supported by substantial evidence, and we review de novo the facts most favorable to the People to determine whether the officers' conduct in performing the protective sweep of defendant's home was reasonable under the Fourth Amendment. (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729]; *People v. Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].) Pursuant to article I, section 28, subdivision (d) of the California Constitution, we evaluate the legality of this

police conduct under federal constitutional standards. (*People v. Woods* (1999) 21 Cal.4th 668, 674 [88 Cal.Rptr.2d 88, 981 P.2d 1019].)

In *Buie*, the United States Supreme Court set out the legal standard for a protective sweep, a limited police search of premises designed to ensure officer safety. (*Buie, supra,* 494 U.S. at p. 327 [110 S.Ct. at pp. 1094-1095].) The court noted that "the Fourth Amendment bars only unreasonable searches and seizures," and that the determination of "reasonableness" depended on a balancing of "the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." (*Buie,* at p. 331 [110 S.Ct. at p. 1096].) Like a *Terry* stop and frisk (*Terry v. Ohio* (1968) 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889]), and the preventative search of an automobile for weapons during a roadside encounter (*Michigan v. Long* (1983) 463 U.S. 1032 [103 S.Ct. 3469, 77 L.Ed.2d 1201]), a protective sweep could be justified though an officer lacked both a warrant and probable cause to believe that officer safety was threatened. The court announced a "reasonable suspicion" standard: "[W]e hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." (*Buie,* at p. 334 [110 S.Ct. at p. 1098].) The court concluded that "the reasonable suspicion standard . . . strikes the proper balance between officer safety and citizen privacy." (*Id.* at p. 335, fn. 2 [110 S.Ct. at p. 1099].)

The high court has repeatedly held that in determining the existence of reasonable suspicion, courts must evaluate the " 'totality of the circumstances' " on a case-by-case basis to see whether the officer has " 'a particularized and objective basis' " for his or her suspicion. (*United States v. Arvizu* (2002) 534 U.S. 266, 273 [122 S.Ct. 744, 750, 151 L.Ed.2d 740] (*Arvizu*).) The court has emphasized the importance of allowing the officers on the scene "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' [Citations.]" (*Ibid.*) In addition, the court has been sharply critical of lower court decisions precluding police reliance on facts consistent with an innocent as well as a guilty explanation. (*Id.* at p. 274 [122 S.Ct. at p. 751].) The court has cautioned against restricting the range of facts considered in the calculus of reasonable suspicion. (*Id.* at p. 273 [122 S.Ct. at pp. 750-751]; *Ornelas v. United States* (1996) 517 U.S. 690, 695-696 [116 S.Ct. 1657, 1661, 134 L.Ed.2d 911].) It has embraced the notion that "reasonable suspicion" is an abstract concept, not a " 'finely-tuned standard[]' " (*Ornelas,* at p. 696 [116 S.Ct. at p. 1661]; accord, *United States v. Cortez* (1981) 449 U.S. 411, 417 [101 S.Ct. 690,

694-695, 66 L.Ed.2d 621]) and deliberately avoided encumbering its determination with a " 'neat set of legal rules.' " (*Ornelas*, at pp. 695-696 [116 S.Ct. at p. 1661], quoting *Illinois v. Gates* (1983) 462 U.S. 213, 232 [103 S.Ct. 2317, 2329, 76 L.Ed.2d 527]; *United States v. Sokolow* (1989) 490 U.S. 1, 7-8 [109 S.Ct. 1581, 1585, 104 L.Ed.2d 1].) Finally, the court has warned lower courts to avoid the "unrealistic second-guessing" of police officers acting "in a swiftly developing situation . . . . [Citation.] A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. . . . [Citation.] The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." (*United States v. Sharpe* (1985) 470 U.S. 675, 686-687 [105 S.Ct. 1568, 1575-1576, 84 L.Ed.2d 605].)

 Among the circumstances that are appropriately taken into account in evaluating a protective sweep are the type and location of the police action contemplated following the sweep. Here the officers were about to execute a valid probation search inside a house.[3] *Buie, supra,* 494 U.S. 325, involved a protective sweep in the context of an arrest. Subsequent cases, however, have clarified that its holding is not limited to arrest situations. (*U.S. v. Taylor* (6th Cir. 2001) 248 F.3d 506, 513 [officer left behind to secure residence while search warrant is obtained may conduct protective sweep]; *Drohan v. Vaughn* (1st Cir. 1999) 176 F.3d 17, 22 [officers executing search warrant may conduct protective sweep]; *U.S. v. Patrick* (D.C. Cir. 1992) 959 F.2d 991, 996-997 [police may conduct protective sweep of bedroom after lessee has given consent to search other parts of apartment].) Furthermore, a respected treatise notes that when officers are rendering aid, they may conduct a protective sweep of the premises so long as the requirements of *Buie* are met. (3 LaFave, Search and Seizure (3d ed. 1996) § 6.6(a), pp. 401-402.) Thus, we conclude a security sweep may properly precede a probation search.

The officers' safety concerns were increased by the probable duration of the search, the fact that it would occur on their "adversary's 'turf' " (*Buie, supra,* 494 U.S. at p. 333 [110 S.Ct. at p. 1098]), and the inherent distraction of conducting a careful examination of all the nooks and crannies of a probationer's bedroom. We reject the notion that a protective sweep is *always* justified prior to a search. However, a prudent officer will consider

---

[3]Though *Buie* and the current case involve a protective sweep of a residence conducted after the officers were lawfully inside, we do not mean to suggest that the facts and circumstances can *never* justify the entry of a home solely to conduct a sweep to ensure the safety of officers lawfully conducting a search or effecting an arrest outside the home. (See, e.g., *People v. Maier* (1991) 226 Cal.App.3d 1670, 1673-1677 [277 Cal.Rptr. 667].)

the safety concerns triggered by a search in determining the appropriateness of first conducting a sweep and a reviewing court must do the same.

Further, the type of criminal conduct underlying the arrest or search is significant in determining ·if a protective sweep is justified. The probation search in this case was based on search and seizure conditions in two different probation grants to Barajas, a convicted drug user. In addition, defendant, who Rosin reasonably believed shared the residence with Barajas, appeared to be under the influence of drugs when the officers contacted him. Thus, it was reasonable to conclude that the residence was the site of ongoing narcotics activity. Firearms are, of course, one of the " 'tools of the trade' " of the narcotics business. (*People v. Thurman* (1989) 209 Cal.App.3d 817, 822 [257 Cal.Rptr. 517].) In Rosin's opinion, based on his experience and training, drug users and those who associate with them are apt to have weapons in the house and have transients "in and out of their house at all times of the day or night." In this particular case, the opinion that others might be present was buttressed by Rosin's observation of two vehicles parked in front of the house and a trailer parked in the driveway. Finally, Rosin testified that he had been at that residence before and "knew there was at least one other person who was around on occasion."

Defendant argues that this information is insufficient to satisfy *Buie*. We disagree. In the instant case, the information known to the investigating officers, filtered through the lens of their experience and training, justified the protective sweep undertaken. Defendant first attacks the significance of the presence of the two cars, relying on *People v. Hernandez* (1994) 30 Cal.App.4th 919 [35 Cal.Rptr.2d 916], a case we find inapposite. *Hernandez* suppressed evidence found during the execution of a search warrant because the affidavit failed to establish a sufficient nexus between the residence searched and criminal activity. (*Id.* at p. 924.) According to the affidavit, the officers observed a known narcotics dealer park a particular Camaro behind the residence on one occasion. During a narcotics transaction, the officers saw the dealer driving a particular Oldsmobile, and, weeks later, they also saw this car parked behind the residence. No information was provided as to whether the dealer ever owned the residence or received mail there or even entered it. No information was presented that the dealer owned either the Camaro or the Oldsmobile. (*Id.* at pp. 923-924.) On this basis, the court refused to find that the presence of the two cars justified a conclusion by the magistrate that there was a fair probability that the place to be searched contained contraband. (*Id.* at pp. 924-925.) *Hernandez* is of little use to defendant here. In that case, the court concluded that the presence of the two cars did not establish *probable cause* to believe that a *particular individual* (the narcotics dealer) utilized the residence searched for illegal activity. In

our case, however, we conclude simply that the presence of two cars located directly in front of the residence created a *reasonable suspicion* that *one or more* individuals linked to those cars were at the residence.

Defendant also contends that the cars could have belonged to him or to "one or more neighbors who parked on a heavily used street 'in front' of [his] residence." While reasonable, these suppositions do not undermine the reasonableness of the officers' conclusion. Moreover, we defer to the officers' "familiarity with the customs of the area's inhabitants" (*Arvizu, supra,* 534 U.S. at p. 276 [122 S.Ct. at p. 752]) in reviewing the likelihood that, in the particular neighborhood involved, one would park a car in front of a house with which he or she had no connection.

Defendant correctly argues that "the mere abstract theoretical 'possibility' that someone dangerous might be inside a residence does not constitute 'articulable facts' " justifying a protective sweep. ■ Where an officer has no information about the presence of dangerous individuals, the courts have consistently refused to permit this lack of information to support a "possibility" of peril justifying a sweep. (*U.S. v. Chaves* (11th Cir. 1999) 169 F.3d 687, 692 ["[I]n the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officer's lack of information cannot justify the warrantless sweep in this case. [Citations.]"]; *U.S. v. Colbert* (6th Cir. 1996) 76 F.3d 773, 777-778 ["Officer Hawes testified that he 'didn't have any information at all' when asked whether he had information that anyone was inside the Lewis apartment prior to his decision to conduct the protective sweep. . . . 'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place."].) ■ These cases simply do not apply to our situation, where, among other things, Rosin observed two cars (and a trailer) parked sufficiently close to the residence to create a reasonable possibility that former occupants of the vehicles might be inside. Thus, unlike the cases defendant cites, Rosin relied on factual observations to create a reasonable, not simply theoretical, possibility of the presence of others.

Defendant also contends that Rosin "did not articulate a factual basis for believing that the unidentified 'other person' posed a danger to officer safety." To the extent defendant argues that there must be specific information that a person inside the residence is dangerous, we disagree. As articulated in *Buie*, the test is whether the officer has a reasonable suspicion, based on facts. As *Arvizu* makes clear, the officer's training and experience can be critical in translating observations into a reasonable conclusion. Here, Rosin not only had a reasonable suspicion that others were present at the residence,

but that a convicted drug user resided there and that recent drug activity had occurred there. Relying on these facts and his expertise, Rosin formed the reasonable opinion that these other persons would pose a danger to him during the search. No more was needed to permit the limited intrusion of a protective sweep.

Defendant argues that permitting a protective sweep in circumstances such as these erases the line carefully drawn to protect the privacy of nonprobationers living with those subject to a search and seizure condition. (See generally *People v. Woods, supra,* 21 Cal.4th at p. 682.) It is beyond dispute that the officers could not have searched defendant's bedroom pursuant to Barajas's search clause, but would be permitted to enter it while conducting a valid protective sweep. But defendant's contention ignores the limited scope of the intrusion permitted by *Buie.* ▇ There, the court emphasized "that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete [the police action] and depart the premises." (*Buie, supra,* 494 U.S. at pp. 335-336 [110 S.Ct. at p. 1099], fn. omitted.) Though this indisputably trenches into the privacy of nonprobationers, it does not eliminate their rights.

▇ In fashioning the limits imposed by the Fourth Amendment, we cannot lose sight of the fact that police work is an often dangerous enterprise. ▇ When the federal Supreme Court balanced officer safety and personal privacy in *Terry v. Ohio, supra,* 392 U.S. 1, it concluded that a preventative search should be tested under a relatively relaxed standard, reasonable suspicion. The policy that drove that decision resonates in our case. "We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. . . . [¶] In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves . . . in situations where they may lack probable cause . . . . When an officer is justified in believing [that danger exists], it would appear to be clearly unreasonable to deny the officer the power to take necessary measures . . . to neutralize the threat of physical harm." (*Id.* at pp. 23-24 [88

S.Ct. at p. 1881], fn. omitted.) ▆▆ The limited protective sweep initiated by Rosin was, we believe, a necessary step taken to neutralize such a threat. We uphold it.

II. *The Search and Seizure Condition**

. . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

We affirm the judgment.

Jones, P. J., and Stevens, J., concurred.

A petition for a rehearing was denied April 1, 2003, and appellant's petition for review by the Supreme Court was denied May 14, 2003.

---

*See footnote, *ante,* page 857.