Filed 5/27/15  P. v. Campos CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>CARLOS SOTO CAMPOS,<br><br>　　　Defendant and Appellant. | A141409<br><br>(Humboldt County<br>Super. Ct. No. CR1304707) |

Defendant Carlos Soto Campos pleaded guilty to a felony count of accessory after the fact[1] after the trial court denied his motion to suppress evidence obtained during a warrantless search of his home.  On appeal, he challenges the suppression ruling on the grounds that the evidence was obtained by a police officer who improperly went onto his porch and subsequently searched the residence without justification.  We reject these claims and affirm.

I.

FACTUAL AND PROCEDURAL
BACKGROUND

Around 11:00 p.m. on October 11, 2013, Eureka Police Officer Timothy Cooper participated in a traffic stop of a vehicle containing one minor and two adults, neither of whom was Campos.  The minor consented to a search of his person, and approximately four grams of marijuana were found in his pocket.  Officer Cooper assisted in an inventory search of the vehicle before it was towed.  In the glove box, he found Campos's

---

[1] This count was brought under Penal Code section 32.

picture identification and an envelope on which a phrase similar to "1600, seven pounds, OG purple cush" was written. Officer Cooper had investigated dozens of marijuana-sales cases, and he recognized that this phrase was "associated with marijuana and marijuana sales."

The vehicle was registered to Campos, but none of the vehicle's occupants were able to provide information about him or explain why they were in his vehicle. The occupants stated they had been watching movies at a residence on the same street as that of the address on Campos's identification card and were using the vehicle to go get food. Officer Cooper and another officer decided to go to that address to "inquire . . . if these people were allowed to have the vehicle and what the situation was with the minor being in possession of marijuana, his relationship to Mr. Campos." Officer Cooper also asked dispatch to perform "a wants and warrants check" of Campos. Dispatch responded that there were possible warrants but did not confirm any warrants until later.

Officer Cooper, the other officer, and a police trainee arrived at Campos's residence around midnight. Campos was standing outside the residence. Officer Cooper recognized Campos from his picture on the identification card and asked, while standing about fifteen feet away, if he could speak with him. Campos "was cooperative" and "said [the officer] could" speak with him. At Officer Cooper's request, Campos then confirmed his name and showed another form of picture identification. When Campos asked why the officer wanted to speak with him, Officer Cooper responded by asking Campos if they could speak inside due to the cold weather. Campos "expressed that [they] could and motioned [Officer Cooper] toward the door, then walked with [the officer] up onto the porch." Campos "motioned for [Officer Cooper] to go inside," but "[a]s a matter of respect," the officer "motioned back for him to open the door to go in." Around the same time, Officer Cooper noticed syringes in an open pocket of a backpack hanging from the porch area.

The front door opened, and a woman whom Officer Cooper had previously arrested for possession of methamphetamine came to the doorway.[2] Officer Cooper and the woman discussed her probation status, and she stated that she had a medical recommendation for marijuana "[b]ut that none of the marijuana in the residence belonged to her." Officer Cooper noticed "a strong odor emitting from the residence that could only be the odor of marijuana" and asked Campos why the residence "smell[ed] like a big marijuana plant." Around the same time, the officer heard a noise from inside the house. The woman said that a juvenile was inside but that he did not live there and she and Campos were not his parents.

Campos "began to shut the door on" Officer Cooper, but "knowing that there's an unknown juvenile in there, the odor, the circumstances leading up to [that moment]," Officer Cooper chose to detain and handcuff Campos. Officer Cooper called out to the juvenile, telling him to come out, and he then handcuffed the woman. The juvenile entered the kitchen, which was right inside the door, and the officer entered the residence and had the juvenile and the woman sit down. Officer Cooper then "did a protective sweep of the residence looking for additional juveniles and any armed subjects." At the hearing on the motion to suppress, he explained why he thought a protective sweep was warranted:

> [T]here was a possibility Mr. Campos was wanted. There[] was a strong possibility that there [were] drugs in the residence. There [were] juveniles whose parents were not there. . . . [T]here was one in the vehicle . . . that's associated with the residence . . . .
>
> . . . [N]arcotics and weapons sort of go hand-in-hand as do armed subjects and narcotics. Narcotics are a protected substance by those you deal with. Sometimes they use force, even deadly force, to protect that substance. I wanted to make sure there were no armed subjects inside the residence.

While moving through the residence, Officer Cooper saw "obvious indicators of drug sales" and "drugs . . . in plain view." The items included approximately 25 pounds

---

[2] It is not clear from the record who opened the door.

3

of processed marijuana bud, almost 2 grams of concentrated cannabis, less than one gram of methamphetamine, a methamphetamine pipe, and two digital scales, one of which had a white crystalline substance on it. There was also "a box of sandwich baggies," a "booklet" with dollar amounts and Campos's name written in it, and a "sort of a shrine of Jesus Malverde who has been documented . . . as a patron saint[] of narcotics trafficking" with a "money offering" before it. As Officer Campos was conducting the protective sweep, dispatch confirmed that Campos had multiple warrants for his arrest. Officer Cooper collected the contraband, and Campos was arrested.

Campos was charged with felony counts of possessing marijuana for sale and providing a place for manufacturing, storing, or distributing a controlled substance.[3] He pleaded not guilty and moved to suppress "[a]ll physical evidence discovered as the result of the unconstitutional search of [his] residence." The only witness at the suppression hearing was Officer Cooper. The trial court found that Officer Cooper's discovery in the vehicle of the envelope with marijuana-related writing, combined with "the odor of marijuana at the . . . residence[,] gave rise to Officer Cooper[’s] having a reasonable suspicion of criminal activity." Additionally, the court found that Campos gave consent for Officer Cooper "to enter the . . . residence," which was not revoked until Campos attempted to close the front door, and that "the protective sweep was appropriate for both officer safety and to prevent possible destruction of evidence." The court therefore denied the motion.

As part of a subsequent plea deal, the original two counts against Campos were dismissed in exchange for his pleading no contest to a new felony count of accessory after the fact. He was sentenced to 300 days in county jail with credit for 300 days served and released from custody.

---

[3] The first count was brought under Health and Safety Code section 11359, and the second count was brought under Health and Safety Code section 11366.5, subdivision (a).

4

A. *Standard of Review.*

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " (*People v. Redd* (2010) 48 Cal.4th 691, 719.)

B. *Officer Cooper's Entry onto the Porch and Detention of Campos Were Lawful Because Campos Consented to the Entry.*

Campos contends that his rights under the Fourth Amendment were violated by Officer Cooper's initial entry onto the porch and subsequent detention of Campos without a warrant. Both claims fail because substantial and uncontradicted evidence reflects that Campos voluntarily consented to the officer's entry onto the porch.[4]

The Fourth Amendment prohibition against the warrantless entry of a person's home, whether to detain a suspect or otherwise, does not apply to situations in which voluntary consent has been obtained. (*Florida v. Jardines* (2013) 133 S.Ct. 1409, 1414-1415; *Illinois v. Rodriguez* (1990) 497 U.S. 177, 181; *Payton v. New York* (1980) 445 U.S. 573, 576; *In re Gregory S.* (1980) 112 Cal.App.3d 764, 773-774.) "[C]onsent to enter may be expressed by actions as well as words." (*People v. Harrington* (1970) 2 Cal.3d 991, 995.) It must be "voluntarily given" and cannot be "the result of duress or coercion, express or implied." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 248.) The question whether consent was given voluntarily is a question of fact to be determined in light of all the circumstances. (*Id.* at pp. 248-249.)

Campos "does not concede" that he consented to Officer Cooper's presence on the porch, but the record amply supports the trial court's finding to the contrary. Before

---

[4] Because we conclude that Campos consented to the officer's entry onto the porch, we need not decide whether the Attorney General is correct that the entry was alternatively valid as part of a " 'knock and talk' procedure" under *People v. Rivera* (2007) 41 Cal.4th 304, 310-311.

entering the porch, Officer Cooper asked if he could speak with Campos, and Campos "was cooperative" and agreed. When the officer asked if they could speak inside, Campos replied that they could and "motioned [the officer] toward the door, then walked with [him] up onto the porch." Thus, substantial evidence shows that Campos affirmatively acquiesced to Officer Cooper's entry onto the porch.

Campos asserts that even if he did agree that Officer Cooper could enter the porch, his consent was not voluntary because it was the result of "a show of authority." He argues that "[t]he officers' conduct, from the moment of their approach at midnight[] to their request for identification, would lead any reasonable person to believe that he was not free to ignore [Officer Cooper's] request." But there is substantial evidence to the contrary. No weapons were drawn, no explicit demands were made, and Campos was not in custody when his consent was given. (See *People v. James* (1977) 19 Cal.3d 99, 113 [finding voluntary consent where "the arresting officer neither held defendant at gunpoint, nor unduly detained or interrogated him; the officer did not claim the right to search without permission, nor act as if he intended to enter regardless of defendant's answer"].) And the late hour is of little significance: when the police arrived, Campos was already outside, and he appeared to welcome the conversation Officer Cooper initiated.

Campos attempts to analogize this case to *United States v. Edmondson* (11th Cir. 1986) 791 F.2d 1512. In *Edmondson*, a number of FBI agents with no warrant surrounded the defendant's apartment with weapons drawn. (*Id.* at p. 1514.) Some of the agents knocked on the door, and upon seeing the defendant look out a window, an agent demanded that he open the door. (*Ibid.*) In response, the defendant opened the front door, stepped back, and put his hands on his head. (*Ibid.*) The Court of Appeals determined that the defendant did not voluntarily consent to the agents' entry into the home. (*Id.* at p. 1515.)

The facts here have little resemblance to those circumstances. In *United States v. Edmondson*, *supra*, 791 F.2d 1512 there were more law-enforcement agents on the scene, they had their weapons drawn, and the defendant was ordered, not asked, to open the

6

door.  (*Id.* at pp. 1514-1515.)  Here, there were only two police officers and a trainee at the scene.  The officers approached Campos in a non-threatening manner, and there is no evidence they ever drew their weapons.  Officer Cooper asked to talk to Campos inside the residence, and Campos agreed and walked with him onto the porch.  In short, there is substantial evidence that Campos voluntarily consented to Officer Cooper's entry onto the porch, and there is no evidence that the consent was coerced.  Accordingly, the warrantless entry onto the porch and the detention of Campos there were lawful.

C.  *The Warrantless Search of Campos's Residence Was a Valid Protective Sweep.*

Campos also contends that, even if Officer Cooper lawfully entered the porch, the ensuing warrantless search of the home violated the Fourth Amendment.  Specifically, he claims that a protective sweep of the residence was not justified because Officer Cooper failed to articulate facts supporting a reasonable suspicion that someone in the home posed a danger.  We agree with the trial court that a protective sweep was lawful under the circumstances.[5]

Although a warrantless entry into a residence is presumptively unreasonable, the presumption can be overcome by establishing one of the few well-delineated exceptions to the warrant requirement, such as showing justification for conducting a protective sweep.  (*Maryland v. Buie* (1990) 494 U.S. 325, 327; *People v. Celis* (2004) 33 Cal.4th 667, 676-677; *People v. Werner* (2012) 207 Cal.App.4th 1195, 1205.)  "A 'protective sweep' is a quick and limited search of premises, incident to an arrest [or detention] and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  (*Buie*, at p. 327; *Werner*, at p. 1206.)

Protective sweeps in conjunction with an arrest or detention at a suspect's home are proper "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to

---

[5] In light of this conclusion, we need not determine whether the search was also justified by exigent circumstances, another issue raised by the parties.

those on the arrest scene." (*Maryland v. Buie*, *supra*, 494 U.S. at p. 337; *People v. Werner*, *supra*, 207 Cal.App.4th at p. 1206.) Reasonable suspicion is determined on a case-by-case basis under the " 'totality of the circumstances.' " (*United States v. Arvizu* (2002) 534 U.S. 266, 273; *People v. Ledesma* (2003) 106 Cal.App.4th 857, 863-864.) Officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person' " (*Arvizu*, at p. 273), and "the type of criminal conduct underlying the arrest or search is significant in determining if a protective sweep is justified" (*Ledesma*, at p. 865).

Here, Officer Cooper articulated several facts supporting a reasonable suspicion that there might be additional people in the house who could pose a danger. At the time Officer Cooper decided to perform the protective sweep, he had several reasons to suspect the residence contained illegal drugs, based on the smell of marijuana, the woman's statements, the drug-sale-related document found in the vehicle, and the syringes on the porch. He also had reason to suspect that there might be other people in the house, based on the juvenile's presence and the statements of the people involved in the traffic stop that they had been at the residence earlier in the evening. Under these circumstances, it was reasonable to believe not only that there might be other people in the residence, but also that they might be armed. "Firearms are . . . one of the ' "tools of the trade" ' of the narcotics business." (*People v. Ledesma*, *supra*, 106 Cal.App.4th at p. 865; *People v. Thurman* (1989) 209 Cal.App.3d 817, 822.) As Officer Cooper stated, in his experience "narcotics and weapons sort of go hand-in-hand," and people involved with narcotics "[s]ometimes . . . use force, even deadly force, to protect [those] substance[s]." The totality of the circumstances, informed by the deductions Officer Cooper drew from his own experience, justified the protective sweep. (*United States v. Arvizu*, *supra*, 534 U.S. at p. 273; see also *Ledesma*, at pp. 866-867 [upholding protective sweep where officer knew convicted drug user lived in the home and several parked vehicles near the home created "a reasonable possibility that former occupants of the vehicles might be inside"].)

Campos relies on *People v. Celis*, *supra*, 33 Cal.4th 667, in which our state Supreme Court concluded that a protective sweep was unwarranted when officers entered a residence with "no knowledge of the presence of anyone in [the] defendant's house." (*Id.* at pp. 679-680.) When the police detained the *Celis* defendant outside his home, they knew his wife and possibly a juvenile lived there, but they "had no knowledge of the presence of anyone in [the] house" at that time. (*Ibid.*) Here, in contrast, Officer Cooper knew from the vehicle stop that several people had been in and out of Campos's residence that evening, and he could reasonably suspect there might be other people inside in addition to the woman and juvenile. This suspicion, combined with the likely presence of drugs, justified Officer Cooper's decision to determine whether anyone else who posed a danger was present. Accordingly, we conclude that the search of the residence was a valid protective sweep.

## III.
### DISPOSITION

The judgment is affirmed.

_____
Humes, P.J.

We concur:


_____
Margulies, J.


_____
Dondero, J.