Filed 6/7/21  P. v. Brown CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C091732 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE015841) |
| v. | |
| STANLEY RAY BROWN, | |
| Defendant and Appellant. | |

Defendant Stanley Ray Brown pleaded no contest to drug possession for sale with a gun enhancement and being a felon in possession of three firearms.  On appeal, he claims error in the denial of his motion to suppress evidence found in a warrantless search of his residence.  (Pen. Code, § 1538.5.)[1]  As we will explain, we agree that the search of the second floor of the residence did not meet the legal requirements of a valid

---

[1]  Undesignated statutory references are to the Penal Code.

1

protective sweep.  Although the Attorney General argues additional grounds to uphold the search, none are valid.  Consequently, we reverse the judgment and remand for further proceedings related to the plea.

BACKGROUND

*Preliminary Hearing*

At the preliminary hearing, the parties stipulated there was no search warrant involved in this case.  Sacramento County Sheriff's Deputy Benjamin Gil was the sole witness.  He testified that on September 1, 2019, he responded to a 911 call from Sarah Anderson's mother, who told dispatch that Anderson and her boyfriend, who was later determined to be defendant, were arguing and physically fighting, and that there were pistols and rifles at their apartment.

Deputy Gil checked the department's known persons finder database and learned defendant had an active felony no-bail warrant and past convictions involving firearms and sales of narcotics.  He also learned a person named J. Copes, who was on formal searchable probation, listed her probation address of record as the same apartment.  He did not verify whether Copes still lived there; he did not contact the probation department, check Copes' criminal record, or check the "I-CLETS" database.  Gil was not aware that Copes was actually then incarcerated.[2]

---

[2]  The Attorney General argues there is no evidence Copes was incarcerated at the time of the search, which occurred fewer than five months after Copes' April 2019 sentencing to two years in jail.  At the time of the hearing, the prosecutor did not contest the assertion that Copes was incarcerated at the time of the search, and the magistrate seemed to accept this conclusion when granting judicial notice, as we later explain.  The Attorney General points to Copes' rap sheet to argue that Copes "would have been on probation" on the date of the search, but we read the relevant entry to indicate only that Copes had received a five year grant of probation in July 2018.  Her probable status as a probationer at the time of her sentencing does not signal her release from a two-year custody sentence after serving five months.  In any event, Copes' custody status at the time of the search is not a dispositive factor in this appeal; it is undisputed that she was not in the apartment at the

2

Anderson answered the door when officers knocked, and then stepped outside. Deputy Gil did not see any physical injuries to Anderson, and she did not seem upset. She told him everything was fine inside the apartment. Gil heard a male voice inside, he asked the man if he was "Stanley," and the man said: " 'Yeah.' " Gil informed Anderson of defendant's warrant and she let the officers inside.

Once inside, deputies walked through the first floor to look for any other persons. Deputy Gil testified the deputies "called for [defendant] because initially [he] heard footsteps going back upstairs. [They] called for him by name. He came down. He was detained on the stairs." Gil later clarified that, while the other deputies checked the first floor, he "held at the stairwell because [he] knew [defendant] was probably upstairs and called for him to come down." He did not ask defendant or Anderson whether Copes lived at the apartment and he did not call for Copes to come out of the apartment.

After defendant was detained without incident Deputy Gil went upstairs to the second floor. When asked why he went upstairs, Gil responded that he was "[l]ooking for additional subjects." The prosecutor asked him: "Why?" to which Gil replied: "Given the area and the possibility of firearms inside the residence." The prosecutor then asked: "Did the information that you have [*sic*] from dispatch prior to arriving play any role in that?" Gil answered: "Yeah. The original caller said there were several firearms inside the house." There was no testimony that anyone asked defendant or Anderson whether anyone else lived at the apartment or saw or heard anything of any significance on the stairs or upstairs before ascending to the second floor.[3]

time of the search and that no one followed up on the probation record or asked the apartments' two occupants anything about her before searching upstairs.

[3] Although the Attorney General asserts that there was the sound of a barking dog upstairs, there is no evidence that anyone heard the dog *prior* to ascending the stairs. The sole mention of the dog barking behind a closed door in one of the upstairs bedrooms came during Deputy Gil's explanation on cross examination as to why he did not search one of the upstairs bedrooms. Further, although the Attorney General asserts that Deputy

Deputy Gil entered one of the upstairs bedrooms and initially checked under the bed "[b]ecause that's a common[]place for people to hide," did not see anybody, but discovered a pellet gun and a rifle case. Gil testified the case "was closed, and [he] grabbed it, and it was heavy like an item was in there." Based on his training and experience, upon seeing the case he immediately believed it contained a rifle. He then opened the case and found a scoped bolt action style rifle. Gil continued to look around that bedroom and found indications defendant lived in the room, such as mail and prescription bottles with defendant's name, along with male clothing, "in plain view." He and the other deputies then "went to other rooms" and "made sure there was no one else." But they avoided accessing one of the bedrooms that contained a "very large barking dog" because they "didn't want to get bit."

Deputy Gil then returned downstairs and told defendant, who was in handcuffs, that he had discovered a rifle. Defendant told him the rifle belonged to a roommate. Gil asked defendant for his consent to search for additional firearms and defendant said a .38 revolver belonging to his stepfather was in a drawer upstairs. He obtained defendant's consent to retrieve the revolver and obtained Anderson's consent to search the entire apartment. Gil returned to the second-floor room where he had found the rifle and located a loaded revolver in a dresser, a loaded pistol in a trashcan, 36.82 grams of methamphetamine in the same trashcan, an open box of sandwich bags on the dresser, a scale on the dresser, and three cell phones throughout the room. Gil opined the methamphetamine was possessed for sale.

---

Gil heard footsteps going up the stairs after the officers called out to appellant, that assertion misrepresents the testimony. Instead, Gil testified that the deputies "called for" defendant before detaining him "because initially [Gil] heard footsteps going back upstairs. We called for [defendant] by name. He came down." Gil did not testify that any sound was heard on the stairs or upstairs *after* defendant's detention, which is when the deputies went upstairs to search.

4

Deputy Gil never located Copes or ever learned whether Copes lived at the address. The trial court took judicial notice of Copes' criminal record, and specifically that she was sentenced to two years in jail on April 3, 2019.

After Deputy Gil's testimony, defendant made a motion to suppress all evidence discovered at the apartment under section 1538.5. The magistrate summarized Gil's testimony and concluded "they find essentially, or he does, what he was looking for, in part, which was any potential firearms in the home that they know that [defendant] cannot possess[]. . . . [¶] And he obtains the consent of [defendant], and everything else is found after he obtains consent from [defendant]. And some things are in plain view as part of that consent. [¶] . . . I don't see this as some issue that's connected to [Copes] being on searchable probation. Even if she were not, everything that transpired, as far as the search I find to be proper, that they can conduct the search to [*sic*] as a protective sweep to insure [*sic*] their safety. [¶] . . . They could be looking for anybody else that potentially might be in the home knowing that there are firearms somewhere in the home. [¶] So I would not grant the 1538.5 motion." The court then held defendant to answer on the amended complaint.

*Plea and Sentencing*

Defendant was ultimately charged with unlawfully possessing methamphetamine for the purpose of sale (Health and Saf. Code, § 11378; count one) with the enhancement he did so personally armed with a firearm (§ 12022, subd. (c)), unlawfully possessing methamphetamine while armed with a loaded handgun (Health and Saf. Code, § 11370.1, subd. (a); count two), and three counts of being a felon in possession of a firearm (§ 29800, subd. (a)(1)) for possessing a "loaded 9mm handgun" (count three), a .38-caliber revolver (count four), and a "bolt action rifle" (count five).

Defendant filed a motion to dismiss the information with the trial court, arguing the magistrate improperly denied the motion to suppress. Relying on the preliminary hearing transcript and not taking any further evidence, the court denied the motion.

5

Defendant pleaded no contest to unlawful possession of methamphetamine for the purpose of sale with the gun enhancement (count one) and being a felon in possession of a .38-caliber revolver (count four). The trial court sentenced defendant to the stipulated five years comprised of the low term of 16 months for methamphetamine possession, three years for the gun enhancement, and one-third the middle term of eight months for felon in possession of a revolver. The court imposed a $300 restitution fine but converted that to nine days of actual time to run concurrently,[4] imposed an $80 court operations assessment (§ 1465.8), a $60 conviction assessment (Gov. Code, § 70373), and struck all non-mandatory fines. The court then dismissed all other counts.

Defendant timely appealed. The case was fully briefed on December 30, 2020, and assigned to this panel on January 29, 2021. Although this court denied defendant's motion for calendar preference on February 2, 2021, we notified counsel in March that we were prepared to decide the case and, on defendant's request, calendared the case for oral argument in April. The case was argued and submitted on May 19, 2021.

DISCUSSION

Defendant contends the magistrate and trial court erred in denying his motion to suppress. The Attorney General first counters that the deputies' initial search of the upstairs was a valid protective sweep. As discussed below, we agree with defendant that the magistrate's relevant findings of fact are not supported by substantial evidence, and the legal conclusion that the search was a protective sweep was error.

---

[4] We note the court presumably converted the fine under section 1205 even though that section does not permit conversion of restitution fines. (§ 1205, subd. (f).)

6

# I

## *Legal Standards*

"The motions before the trial court were submitted on the record of the preliminary hearing pursuant to [§ 1538.5]. In these situations we disregard the findings of the trial court and review the determination of the magistrate." (*People v. Nonnette* (1990) 221 Cal.App.3d 659, 664.) On review of the denial of a motion to suppress evidence, " '[w]e view the evidence in a light most favorable to the order denying the motion to suppress.' " (*People v. Tully* (2012) 54 Cal.4th 952, 979.) We defer to the magistrate's express and implied factual findings that are supported by sufficient evidence. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 592.) We exercise our independent judgment in determining the reasonableness of the search. (*Ibid*.)

The Fourth Amendment guarantees the right to be free of unreasonable searches and seizures by law enforcement personnel. (U.S. Const., 4th Amend.) " 'It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable.' [Citation.]" (*People v. Thompson* (2006) 38 Cal.4th 811, 817, quoting *Payton v. New York* (1980) 445 U.S. 573, 586.) When police conduct a search or seizure without a warrant, the prosecution has the burden of showing the officers' actions were justified by an exception to the warrant requirement. (*People v. Camacho* (2000) 23 Cal.4th 824, 830; *People v. Chavez* (2008) 161 Cal. App.4th 1493, 1499.)

# II

## *Protective Sweep*

The "protective sweep" doctrine is a recognized exception to the warrant requirement for searches and seizures. (See *Maryland v. Buie* (1990) 494 U.S. 325, 327).) The doctrine provides that law enforcement may conduct a limited, brief search of premises to ensure officer safety, if they have a reasonable suspicion that the area to be swept "harbor[s] an individual posing a danger to the officer or others." (*Ibid*.; see

*People v. Ormonde* (2006) 143 Cal.App.4th 282, 292.) There must be " 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.' " (*People v. Ledesma* (2003) 106 Cal.App.4th 857, 863 (*Ledesma*).) This requires "a reasonable suspicion *both* that another person is in the premises *and* that that person is dangerous." (*People v. Werner* (2012) 207 Cal.App.4th 1195, 1206.)

Protective sweeps do not permit "a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found" (*Maryland v. Buie, supra*, 494 U.S. at p. 335), such as "in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." (*Id.* at p. 334.) This cannot include "searching for evidence" unrelated to what "is necessary to protect the safety of officers and others." (*Id.* at p. 335, fn. 3.)

The protective sweep exception is narrowly tailored to the discovery of potentially dangerous subjects that could cause harm to officers and others. The doctrine does not permit officers to search through homes without a warrant when there is no affirmative evidence of other people present. (See *People v. Celis* (2004) 33 Cal.4th 667, 679 (*Celis*) [finding protective sweep invalid in part because officers "had no knowledge of the presence of anyone in defendant's house"]; *People v. Werner, supra*, 207 Cal.App.4th 1195, 1209 ["the evidence showed nothing more than a generalized concern for officer safety on the part of [the officer]"]; *People v. Yi Chih Chen* (2020) 50 Cal.App.5th 952, 956 ["The mere fact [the officer] could not exclude the possibility of a dangerous person in the home, without more, fails to justify a protective sweep"].)

Here, the record does not contain evidence supporting the required reasonable suspicion that a dangerous individual was upstairs. Although at first blush, it may certainly appear prudent to look through an entire residence at the time of the arrest of one of its occupants in case someone else may be inside and may pose a danger, that is

not the standard. There must be articulable facts supporting a reasonable suspicion that someone upstairs posed a danger to the deputies; here, there were none.

Labeling a warrantless search a protective sweep does not make it so. Nor does the suspected presence of firearms. Although the presence of firearms would certainly bear on the second prong of the analysis and whether subjects present are dangerous (see *Ledesma, supra*, 106 Cal.App.4th at p. 865), firearms are not threatening without someone to wield them. (See *State v. Sharpe* (2008) 174 Ohio App.3d 498, 511 [882 N.E.2d 960, 970] ["The fact that a gun or other weapon is on the premises could give other persons an instrument to use in such an attack. But the gun or other weapon poses no danger to officers absent a person or persons who might use it to launch an attack"].) Evidence of firearms is insufficient by itself to support a protective sweep.

Deputy Gil did not articulate any facts supporting a reasonable suspicion that *someone was upstairs* who posed a danger, nor did he even attempt to do so. All the facts Gil supplied were related to the search of firearms. When asked why he was looking for other people, he replied "[g]iven the area and the possibility of firearms inside the residence" based on Anderson's mother's information that "there were several firearms inside the house." From this, the magistrate concluded the deputies "*could be* looking for anybody else that *potentially* might be in the home *knowing that there are firearms* somewhere in the home." (Italics added.) And when Deputy Gil found the rifle, the magistrate commented: "they find essentially, or he does, what he was looking for, in part, which was any potential firearms in the home."

Deputy Gil's actions support the magistrate's conclusion that he was primarily concerned with locating firearms; there is no evidence that Gil had any information that caused him to reasonably suspect that there was an individual upstairs who posed a danger to the deputies. As we have described in detail above, Gil testified that he stopped his search in the first room he entered upstairs, to pull out the rifle case from under the bed and to open it, as well as to look for indications defendant lived in the room. He

9

testified that deputies did not even search one of the upstairs rooms during the "sweep" because of a barking dog; that he never asked Anderson or defendant whether anybody else was in the apartment; and that he never announced for anyone else to come out. These facts do not support a finding of reasonable suspicion of a dangerous individual.

There is no other evidence in the record that could indicate other people were present to justify the search under the protective sweep doctrine, even acknowledging that courts have found the reasonable suspicion standard met with minimal evidence. In *Ledesma*, the court found "the presence of two cars located directly in front of the residence created a *reasonable suspicion* that *one or more* individuals linked to those cars were at the residence." (*Ledesma, supra*, 106 Cal.App.4th at p. 866.) In *People v. Maier* (1991) 226 Cal.App.3d 1670, 1675, it was enough that police knew the arrestee "habitually pursued his criminal activities with accomplices in a most dangerous manner." Here, there was nothing.

It was the prosecutor's burden to justify the warrantless search. The Attorney General first relies on the possible presence of firearms to justify the search, which, for the reasons stated above, is not evidence of dangerous people present. Next, the Attorney General points to Copes, "who resided there [and] was on searchable probation." Setting aside the limited probative value of the probation records alone and the deputy's failure to validate the records by any other means, this information had no bearing on whether Copes was present *at the time of the search*. Knowledge that someone other than Anderson and defendant may live at the apartment is not knowledge of another person being present when deputies arrested defendant. (See *Celis, supra*, 33 Cal.4th at pp. 672, 679 [finding protective sweep unjustified where officers' surveillance disclosed defendant's wife and " 'possibly a male juvenile' " lived at the residence but on day of arrest "they had no knowledge of the presence of anyone in defendant's house"].) Otherwise an arrest inside a multi-inhabitant residence could always justify a search of every room regardless of articulable facts someone is currently in the residence posing a

10

threat. This would stretch the protective sweep doctrine beyond its constitutional moorings. (See *id*. at pp. 678, 680 [constitution requires only "a *reasonable suspicion* that the area to be swept harbors a dangerous person" but "a protective sweep may not be based on 'a mere "inchoate and unparticularized suspicion or 'hunch' " ' "].) As we noted earlier, the Attorney General's reliance on sounds upstairs to justify suspicion of additional persons upstairs is unsupported by the record. The argument that Deputy Gil "heard footsteps going up the stairs . . . after the officers had already called out to appellant" does not accurately characterize Gil's testimony that the deputies heard footsteps on the stairs after the first time Gil called defendant's name, when they were still outside. Once inside, they called his name again and defendant came down the stairs where he was detained. Deputy Gil did not say he heard steps upstairs *after* defendant came downstairs. Similarly, Gil testified to hearing the barking dog *after* he had gone upstairs and discovered the rifle; not, as the Attorney General suggests, while he was downstairs. Nor was there any testimony that the barking somehow prompted the search of the second story. Indeed, it appears to the contrary, as the record suggests that the room containing the dog was left unswept.

In summary, the characterization of a walk through search as a protective sweep does not make it so. Officers are required to have facts supporting a reasonable suspicion there was someone in the apartment posing a danger; there were no such facts here. The magistrate's denial of defendant's motion to suppress based on a protective sweep was therefore unsupported by substantial evidence.

III

*Other Exceptions*

We also reject the People's other asserted warrant exceptions.

A. *Probation Search*

The Attorney General first suggests the search was alternatively justified on the basis of Copes' status on formal searchable probation.  "In California, probationers may validly consent in advance to warrantless searches in exchange for the opportunity to avoid service of a state prison term." (*People v. Woods* (1999) 21 Cal.4th 668, 674.)  But "officers generally may only search those portions of the residence they reasonably believe the probationer has complete or joint control over.  [Citation].  That is, unless the circumstances are such as to otherwise justify a warrantless search of a room or area under the sole control of a nonprobationer (e.g., exigent circumstances), officers wishing to search such a room or area must obtain a search warrant to do so." (*Id*. at p. 682.)

Here, even assuming there was some evidence that Copes was a current resident of that apartment, there is no evidence the deputies knew which room was Copes's or that they even tried to garner such evidence.  Deputy Gil was aware defendant and Anderson lived there, so it would be unreasonable to assume Copes held exclusive control over the entirety of the apartment.  The evidence also supports a contrary conclusion because the second-floor room contained evidence defendant lived there.  The warrantless search was not justified as a probation search.

B. *Consent*

Finally, the Attorney General relies on defendant's and Anderson's consents to search the entire apartment, including the second-story bedroom.  " '[T]he rule is clearly established that consent induced by an illegal search or arrest is not voluntary, and that if the accused consents *immediately following* an illegal entry or search, his assent is not voluntary because it is inseparable from the unlawful conduct of the officers.' [Citations.]  The condition of an unlawful arrest renders consent involuntary because

12

such consent is necessarily ' "induced by compulsion, intimidation, oppressive circumstances, or other similar factors inherent in the situation which make that consent less than an act of the free will." ' " (*People v. Espino* (2016) 247 Cal.App.4th 746, 762.)

The consents here are inseparable from the deputies' illegal search because they were given immediately after the disclosure of the rifle. Though the magistrate found these consents proper, it was predicated on the initial search under the bed being appropriate. Because we have determined that conclusion is unsupported, the magistrate's finding as to the consents' validity is also unsupported. (See *People v. Ormonde, supra*, 143 Cal.App.4th at p. 296 [though the defendant consented to the search, the court found "the illegal entry inexorably led to the search and seizure of the contraband challenged here, and defendant's motion to suppress should have been granted"].)

IV

*Conclusion*

"Unquestionably, the work of a police officer in the field is often fraught with danger. At any given moment, a seemingly safe encounter or confrontation with a citizen can suddenly turn into an armed and deadly attack on the officer. Society's interest in protecting police officers must, however, be balanced against the constitutionally protected interest of citizens to be free of unreasonable searches and seizures." (*Celis, supra*, 33 Cal.4th at p. 680.) Because no exception to the Fourth Amendment's warrant requirement was justified here, the deputies' search of the second floor without a warrant was "presumptively unreasonable." (*Ibid*.; *Payton v. New York, supra*, 445 U.S. at p. 586.)

## DISPOSITION

The judgment is reversed. The order denying the motion to suppress evidence is vacated and the matter is remanded to the trial court with directions to enter a new order granting the motion to suppress, permit defendant to withdraw his plea should he choose to do so, and conduct further proceedings as necessary.


      /s/            
Duarte, J.

We concur:


      /s/          
Murray, Acting P. J.


      /s/          
Krause, J.