Filed 10/5/17 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E065359 |
| v. | (Super.Ct.No. RIF1301585 & RIF1209515) |
| BOBBY JOHNNIE MCCLOUD, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

We deny the People's petition for rehearing and modify the opinion filed in this matter on September 27, 2017 as follows:

1. Add the following language at the end of footnote 1 on page 2:
The People filed a petition for rehearing requesting we advise the trial court that it had erred in deeming possession for sale a subordinate count requiring a reduced sentence (one-third the middle term). They point out Penal Code section 1170.1's principal/subordinate sentencing formula does not apply to felonies punishable by indeterminate terms, like McCloud's transportation for sale conviction. We decline to address the issue, as our reversal of the indeterminate term conviction renders it moot.

1

2.  Delete the text of the disposition and replace it with:

We reverse the judgment as to the transportation for sale count, affirm the judgment in all other respects, and remand to the trial court for resentencing.  The People may elect to retry McCloud for transportation for sale at the option of the prosecuting attorney.

Except for these modifications, which do not affect the judgment, the opinion remains unchanged.

CERTIFIED FOR PARTIAL PUBLICATION

SLOUGH
J.

We concur:


MILLER
Acting P. J.


CODRINGTON
J.

2

Filed 9/27/17 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION\***

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E065359 |
| v. | (Super.Ct.No. RIF1301585 & RIF1209515) |
| BOBBY JOHNNIE MCCLOUD, | |
| Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., Judge. Affirmed in part; reversed in part with directions.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

_____

\*  We certify this opinion for publication under California Rules of Court, rules 8.1105(b) and 8.1110, except for parts II.B, and II.C.

1

In late 2012, the police searched a residence where Bobbie Johnnie McCloud happened to rent a room. The officers were initially there to perform a probation search of someone else, but ended up arresting McCloud when they found crack cocaine and a loaded gun inside his bedroom. In early 2013, after McCloud had been released from custody on bail for charges related to that incident, police once again found him in possession of crack cocaine.

The prosecution charged McCloud with felony possession for sale for the 2012 incident, along with three felonies based on firearm possession. For the 2013 incident, the prosecution charged him with felony transportation for sale (Health & Saf. Code, § 11352, subd. (a)), misdemeanor possession of a stun gun by a felon, and misdemeanor resisting an officer. The jury convicted McCloud of all the charges except the three firearm-related felonies. In a subsequent bench trial, the court found McCloud had a prison prior, a prior strike conviction for robbery, and three prior super strike convictions for assaulting an officer with a machine gun, and it sentenced him to a total of 28 years 8 months to life.[1]

McCloud raises three arguments on appeal. He contends we must reverse his transportation for sale conviction because the trial court failed to instruct the jury that "transportation" means *for the purpose of sale* following the 2014 amendment to Health

---

[1] The court deemed transportation for sale the principal count and imposed an enhanced sentence of 25 years to life as a result of the super strikes (Pen. Code, § 1170.12, subd. (c)(2)(A)), plus a two-year enhancement for committing the offense while out on bail (Pen. Code, § 12022.1). It imposed an eight-month sentence for the possession for sale count, plus a one-year term for the prison prior.

and Safety Code section 11352. The People agree the instruction was erroneous but argue the error was harmless because the evidence of intent to sell was overwhelming. Next, he argues we must also reverse the possession for sale conviction because the evidence supporting the charge was the fruit of an unlawful warrantless search. Finally, he argues the trial court abused its discretion by allowing the prosecution to amend the super strike allegations to correct a clerical error after the jury had been discharged.

We conclude McCloud's second and third arguments lack merit, but his first does not. **In the published portion of this opinion,** we conclude the jury instructions for transportation for sale omitted an essential element of the offense and the evidence supporting the missing element was not overwhelming. We therefore reverse that conviction, but affirm the judgment in all other respects.

# I

# FACTUAL BACKGROUND

### A. *The 2012 Incident*

In September 2012, a Riverside County gang task force arrived at probationer R.F.'s residence to perform a probation search. McCloud was standing in the driveway of the home but ran inside and turned off the porch light when he saw the patrol cars approaching. Upon entering the home, the officers encountered four men playing dominoes in the kitchen. One of the officers recognized R.F. and another man he knew to be a gang member, but McCloud did not appear to be among the group.

3

At this point, the officers began a protective sweep of the house, ordering everyone to come out of the rooms. McCloud's cousin, Antonio, came out of McCloud's bedroom. McCloud was in the bathroom and remained there for about thirty seconds and a few more commands before flushing the toilet and emerging. The officers swept through McCloud's room to see if anyone else was inside, and in so doing saw what appeared to be crack cocaine and drug paraphernalia in plain view on a table.

The officers requested and obtained McCloud's consent to more thoroughly search his room. In total, they found 0.9 grams of crack cocaine; a digital scale; a ceramic plate; pills; a Ziploc bag containing about 100 smaller plastic bags; a marijuana grinder and pipe; an operable .22 revolver loaded with six live rounds of ammunition under the mattress; and over $750 in cash, in denominations of $20 or less, stashed in various places near the cocaine. Half of the cocaine lay on the ceramic plate and the other half was packaged inside two plastic baggies. There was cocaine dust on the scale and on a razor blade sitting on the plate.

A cell phone lying in the hallway just outside McCloud's room contained text messages addressed to him. One of the messages was from earlier that day and said, "Can you bring a dime, please?" McCloud had responded, "No. Don't have any."

At trial, a deputy who was part of the search team testified as the prosecution's drug expert. He believed McCloud intended to sell the cocaine found in his bedroom. He based his opinion on the fact McCloud did not appear to be under the influence during the search and was not in possession of a pipe or other device for ingesting the cocaine.

4

McCloud was, on the other hand, in possession of several indicia of sale. The ceramic plate and razor blade would be used to cut the rocks into sellable, smaller amounts that would fit inside a pipe; the scale would ensure the accuracy of those amounts; and the small baggies would be for individual packaging. The expert estimated the cocaine found in McCloud's bedroom was worth about $40 total—there was $20 worth on the plate and $10 worth inside each of the two plastic bags. He explained dealers do not typically keep large amounts of cash on them, but do tend to accumulate money until they have enough to buy more supply. That McCloud had a large amount of cash and a relatively small amount of cocaine indicated he may have been getting ready to resupply. The messages in McCloud's cell phone also indicated he intended to sell the cocaine, as a "dime" refers to $10 worth of a substance and the police found two baggies with $10 worth of cocaine in his room.

The expert also said when he searched the bathroom, he noticed the plunger was wet, indicating it had been recently used. In his experience serving search warrants on suspected drug dealers, they often will try to flush drugs down the toilet as soon as the police arrive. He believed this may have been why McCloud was in the bathroom flushing the toilet when the officers began the sweep.

B.    *The 2013 Incident*

In February 2013, while out on bail for the charges stemming from the 2012 search, McCloud initially resisted a pat down search during which officers found a pill bottle containing marijuana in his pocket. On the passenger seat of the car he had been

5

driving, the officers found a pill bottle containing 1.4 grams of crack cocaine, a stun gun, $45 in cash, and two cell phones.[2]

According to the prosecution's drug expert, the circumstantial evidence of intent was not as strong as it was in the 2012 incident, and he could not be sure whether McCloud planned to sell or use the cocaine the officers found in his car. In response to the prosecutor's question whether McCloud possessed the 1.4 grams of cocaine "for purposes of sale," the expert answered, "It could be and it could not be." He explained: "[N]ormally . . . to prove that it's for sales we want to see things like packaging . . . We want to see a pay-owe sheet. Someone could conceivably possess [1.4 grams] of cocaine for their personal use." The expert said if it had been his case, he would have investigated McCloud's cell phone to see if it contained call logs indicative of dealing. As for the cash McCloud was carrying, the expert viewed $45 as a neutral amount, noting, "He's got money. Everybody has money, but it's hard to say one way or the other on that."

When the prosecution asked the expert how the absence of a crack pipe and the presence of a stun gun and two cell phones factored into his analysis, he responded those facts made him "lean[] more towards sales." He explained that drug dealers often carry weapons to defend themselves and their product because "you're dealing in a business you can't call the police if something happens." He also noted 1.4 grams was "quite a bit for a user to possess for a casual or regular user."

---

[2] It is unclear from the officers' testimony whether the cell phones were in McCloud's pocket or his car, but the point is not material to our analysis.

6

On cross-examination, defense counsel attempted to elicit a more definite opinion on McCloud's intent. The following exchange occurred:

> "Q. Deputy Williams, he could have been possessing it for sales, or he could not have been possessing it for sales, really is what you testified to?
>
> A. Yes, sir.
>
> Q. So he might have been selling drugs, or he might have . . . possessed those for personal use, you just don't know?
>
> A. Without more facts, no, sir, I couldn't really say positively one way or the other.
>
> Q. Okay. So he might have been, you just don't know?
>
> A. That's correct."

On redirect, the prosecutor asked whether the expert's conclusion changed if he considered the contraband found in McCloud's bedroom during the 2012 search. The expert responded, "Based upon what I knew when I was at his house, absolutely I would say he's back in business. That he's selling." On recross, defense counsel asked the expert to confirm his opinion was that McCloud "might have possessed it for sales, might have possessed it for personal use," and the expert replied, "[b]ased upon the facts of this case alone, yes, sir."

C. *Defense Evidence*

McCloud's cousin Antonio had been arrested on the evening of the 2012 search and pled guilty to possession of a controlled substance while armed with a firearm. At McCloud's trial, Antonio said he used to sell drugs to make ends meet. He said on the day of the 2012 search he had sold McCloud three rocks of cocaine for $50. McCloud

7

did not sell drugs—he had a job working as a "sign twirler"—but he had a drug problem and smoked crack at least once a day. McCloud would smoke "primos," a modified type of "blunt" made by cutting open a cigar with a razor blade and replacing the tobacco with marijuana and cocaine. Antonio did not like when McCloud got high and he did not like selling him drugs, but he felt it was necessary to avoid becoming homeless. Antonio also said the gun under McCloud's mattress belonged to him.

D.     *The Verdict*

The jury found McCloud guilty of possession for sale (Health & Saf. Code, § 11351), transportation for sale (Health & Saf. Code, § 11352, subd. (a)), misdemeanor being a felon in possession of a stun gun, and misdemeanor resisting an officer. It found him not guilty of possessing cocaine while armed with a loaded, operable firearm (Health & Saf. Code, § 11370.1), being a felon and narcotic addict in possession of a firearm (Pen. Code, § 29800), and being a felon in possession of ammunition (Pen. Code, § 30305).

## II

## DISCUSSION

A.     *Transportation for Sale Instruction*

The parties correctly agree the trial court failed to instruct the jury with an essential element of transportation for sale (Health & Saf. Code, §11352)—that when McCloud transported the cocaine he intended to *sell* it. Their disagreement concerns only whether the instructional error was prejudicial. McCloud contends it was because the

8

prosecution's circumstantial evidence of intent to sell was not strong and the entire defense theory was based on evidence McCloud was an addict, not a dealer. The People contend the error was harmless because there was overwhelming evidence of an intent to sell. We agree with McCloud. In our view, the circumstantial evidence of McCloud's intent was conflicting, and not particularly strong one way or the other. As a result, we cannot say with confidence the jury would have found him guilty of the offense had it been properly instructed transportation means not just movement from one place to another, but movement for the purpose of sale.

1.     *Additional factual background*

The prosecution charged McCloud with the offense in February 2013. At the time, a defendant could be guilty of violating Health and Safety Code section 11352 if he or she simply transported the proscribed substances. (Health & Saf. Code, § 11352, former subd. (a); Stats. 2011, ch. 15, § 154.) As we explained in *People v. Lua* (2017) 10 Cal.App.5th 1004, 1012 (*Lua*): "Prior to January 1, 2014, section 11379 provided that any person who 'transports' specified controlled substances, including methamphetamine, shall be punished by imprisonment. (§ 11379, former subd. (a); Stats. 2011, ch. 15, § 174.) The courts had interpreted the word 'transports' to include transporting controlled substances for personal use. [Citations.] The statute provided enhanced penalties for a person who 'transports for sale,' as opposed to for some other purpose, but a defendant could be convicted of the offense without proof of intent to sell. (§ 11379, former subd. (b); Stats. 2011, ch. 15, § 174.)"

9

Effective January 2014, the Legislature amended the statute by adding a new subdivision that states, "[f]or purposes of this section, 'transports' means to transport for sale." (Health & Saf. Code, § 11379, subd. (c); Stats. 2013, ch. 504, § 2.) In August 2014, the CALCRIM authors amended CALCRIM No. 2300 to reflect the 2014 statutory amendment by inserting the words "for sale" after the word "transported": "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant (. . . transported *for sale* . . .) a controlled substance." (CALCRIM No. 2300 [August 2014 update], italics added; see also *Lua*, *supra*, 10 Cal.App.5th at p. 1012 [discussing the CALCRIM update].) The authors also added the words "for sale" to the instruction's definition of the term "transports": "A person *transports* something if he or she carries or moves it from one location to another *for sale*, even if the distance is short." (CALCRIM No. 2300, second italics added.)

McCloud's trial began in November 2015. For the transportation for sale charge, the trial court instructed the jury with a pre-amendment version of CALCRIM No. 2300 that did not contain the "for sale" additions:

"The defendant is charged . . . with selling/furnishing/administering/giving away/transporting/importing cocaine base, a controlled substance in violation of [Health & Safety Code section] 11352.

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant transported a controlled substance;

2. The defendant knew of its presence;

10

3. The defendant knew of the substance's nature or character as a controlled substance;

4. The controlled substance was cocaine base;

AND

5. The controlled substance was in a usable amount. [¶] . . . [¶]

A person transports something if he or she carries or moves it from one location to another, even if the distance is short."

During closing argument, the prosecutor argued McCloud was guilty of the offense because he "transported for sale a controlled substance, [1.4 grams] of crack cocaine." As to the transportation element, the prosecutor said, "[A] person transports something if he carries or moves it from one location to another, even if the distance is short. So somebody might be thinking transportation. Okay. That means he had to transport it from Mexico to California. No. Any short distance whatsoever is sufficient. Any movement. [¶] . . . [¶] So the fact that [McCloud] was in the vehicle driving with that on the passenger seat constitutes transportation."

Defense counsel argued McCloud was a drug addict who intended to use, not sell, the cocaine the police found in his car. He pointed out the lack of packaging and paraphernalia indicative of sales and the fact the drug expert could not even be sure of McCloud's intent: "[The drug expert] himself testified that based on the fact that there were no baggies, there were no scales, there were no pay-owe sheets, there isn't an

11

excessive amount of cash. . . . His testimony was that might have been, might have been for sales, or it might have been for personal use."

####    2.    *Analysis*

Health and Safety Code section 11352 as amended at the time of McCloud's trial provided transportation was a crime only if the prosecution established beyond a reasonable doubt the transportation was *for sale*. The jury instruction did not include the new "for sale" element, and as a result it was erroneous. (*People v. Mil* (2012) 53 Cal.4th 400, 409 (*Mil*) [it is error to omit from instructions an essential element of an offense and defendant need not object to preserve the claim for appeal].) As noted, the parties agree on this point. The issue is whether the instructional error was harmless.

Omission of an element of an offense is not reversible per se but rather is subject to the harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18. (*Neder v. United States* (1999) 527 U.S. 1, 4 (*Neder*); *People v. Merritt* (2017) 2 Cal.5th 819, 826, cert. filed May 22, 2017 (*Merritt*).) In cases of omitted elements, our high court has cautioned the error "will be deemed harmless *only in unusual circumstances*, such as where each element was undisputed, the defense was not prevented from contesting any [or all] of the omitted elements, and overwhelming evidence supports the omitted element." (*Merritt*, at p. 828, italics added.)

"Our task, then, is to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'" (*Mil*, *supra*, 53 Cal.4th at p. 417.) In *Neder*, the United States Supreme Court instructed appellate

12

courts to "conduct a thorough examination of the record" and "[i]f, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and *raised evidence sufficient to support a contrary finding*—it should not find the error harmless." (*Neder*, *supra*, 527 U.S. at p. 19, italics added.) As our high court has explained, review for overwhelming evidence is essentially the reverse of a review for substantial evidence to support a conviction: "[U]nder [a substantial evidence review] . . . we would view the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of any facts the jury might reasonably infer from the evidence," however, "our task in analyzing the prejudice from the instructional error is whether any rational fact finder could have come to the *opposite* conclusion." (*Mil*, at p. 418.) Applying this standard here, we must find the error prejudicial if the record contains evidence to support a finding McCloud intended to use, rather than sell, the cocaine.

Having reviewed the record, we conclude it contains such evidence. First of all, and as the prosecution's drug expert pointed out, McCloud was in possession of none of the typical indicia of sales. The cocaine was in a single container (the pill bottle)—McCloud had no baggies or other packaging, no scale, no pay-owe records, and we do not know whether his phone contained any evidence of sales. Additionally, McCloud's cousin testified McCloud was a drug addict who smoked crack on a daily basis, and that his preferred method of ingestion was smoking repurposed cigars filled with marijuana

13

and cocaine, or "primos." That McCloud was found carrying not just the cocaine but also marijuana supports an inference he planned to combine both drugs into a primo. This evidence, coupled with the expert's inability to definitively conclude McCloud intended to sell the cocaine, reasonably supports a finding he did not intend to sell the cocaine but rather would have smoked it to support his addiction.

Two recent California Supreme Court cases inform our analysis. In *Merritt*, the Court found the trial court's failure to instruct the jury with any of the elements of the charged robbery offenses harmless due to the strength of the evidence and the defense theory of the case. (*Merritt*, *supra*, 2 Cal.5th at pp. 831-833.) The defendant had been charged with robbing two different clerks on two different occasions, and both crimes had been caught on the surveillance cameras. (*Id.* at pp. 822-824.) At trial, the defense conceded there was "no question [the victims] were robbed," but argued the defendant had been wrongly identified as the perpetrator from the surveillance videos. (*Id.* at p. 824) Based on this concession and the fact the crimes were recorded, the Court concluded it was impossible the jury would have acquitted the defendant of robbery if they had been instructed on the elements of that offense. The only real issue at trial was identity—there was no dispute the crimes that had been committed satisfied the elements of robbery. Having decided the identity issue against the defendant, it was a foregone conclusion the jury would find the elements of robbery had been satisfied. (*Id.* at pp. 831-833.)

14

The prejudice analysis came out differently in *Mil.* There, the defendant was convicted of first degree murder with robbery-murder and burglary-murder special circumstances under an aiding and abetting theory of liability. (*Mil*, *supra*, 53 Cal.4th at p. 405.) The Court held the trial court erred by failing to instruct on two elements: (1) the defendant was a "major participant" in the burglary and robbery and (2) had acted with reckless indifference to human life. (*Id.* at pp. 408-409.) At trial, defendant contested whether he acted with reckless indifference to human life, and that issue became the focus on appeal. The appellate court concluded the failure to instruct on reckless indifference was harmless, citing all of the evidence supporting an inference the defendant was subjectively aware of a grave risk of death when he participated in the burglary and robbery. (*Id.* at pp. 417-418.) The prosecution had presented evidence the defendant knew his associate, the direct perpetrator of the murder, liked to carry "'big old steak knives with her,'" as well as evidence he himself had violently attacked the victim during the burglary-robbery. (*Id.* at p. 418.)

The Supreme Court concluded the appellate court had used the "less demanding" substantial evidence standard and instead should have looked for evidence to support an inference the defendant was *not* subjectively aware of the risk of death when he participated in the burglary-robbery. (*Mil*, *supra*, 53 Cal.4th at pp. 417-418.) Using the more demanding standard, the Supreme Court found the record contained evidence the defendant told the police during an interview that he was unaware his associate had planned to use any physical violence during the burglary and robbery and that he was

15

unaware she had been armed with a knife.  (*Id.* at pp. 418-419.)  The Court also noted the evidence about the defendant's physical attack on the victim was conflicting.  There was some evidence he had engaged in a violent fist attack, but other evidence suggested his blows did no more than leave the victim a little dazed.  (*Id.* at p. 419.)

Based on the fact the record contained *some* evidence to support the defendant's claim he had no subjective knowledge of the risk of death, the Court concluded "a rational juror, given proper instructions, could have had a reasonable doubt whether defendant was subjectively aware of a grave risk of death when he participated in this burglary and robbery."  (*Mil*, *supra*, 53 Cal.4th at p. 419.)  "It follows," the Court explained, "omission of the element concerning defendant's state of mind was prejudicial and requires reversal of the burglary-murder and robbery-murder special circumstances."  (*Ibid*.)

Reviewing the trial record under the overwhelming evidence standard articulated in *Mil*, we find our case to be more like *Mil* than *Merritt*.  Unlike *Merritt*, the evidence supporting the omitted element (intent to sell) was not overwhelming, the event was not recorded, and defense counsel did not stipulate the evidence satisfied the omitted element.  Rather, the prosecution and the defense adduced conflicting evidence on the issue, as was the case in *Mil*.

The People argue the evidence of intent to sell was overwhelming because the expert opined McCloud intended to sell the cocaine and because McCloud had more cocaine on him that evening than he did in 2012.  We see two problems with this

16

argument.  First of all, the 2012 and 2013 incidents are distinct, and it would be improper for the jury to assume an intent to sell for the transportation charge based on the strength of the evidence supporting the possession charge.  Second, the People overstate the expert's opinion on McCloud's intent.  The difference between 0.9 (the amount McCloud possessed in 2012) and 1.4 grams (the amount he had in 2013) is relatively minor, and the expert himself said a person "could conceivably possess . . . [1.4 grams] of cocaine for their personal use."  Contrary to the People's characterization, we find the expert was ultimately unable to commit to the sales theory.  He began his testimony by stating he could not be sure about intent because McCloud did not possess the typical indicia of sale, and the closest he came to expressing a definite opinion was to say he was "leaning" towards intent to sell based on the presence of the stun gun and the two cell phones.  At multiple points before and after that statement, however, he confirmed he was unsure one way or the other.

We find the expert's refusal to express a firm opinion on intent crucial to our prejudice analysis.  If the very person trained to discern the difference between dealers and users expressed doubts about McCloud's intent, it is only reasonable to assume a properly instructed jury would as well.  Where even the expert on the omitted element does not view the pertinent evidence as strong, we cannot conclude the evidence is so overwhelming as to compel a conviction despite the omission.

We also cannot conclude the prosecutor's reference to the offense as "transportation for sale" during closing argument rendered the error harmless.  In certain

17

circumstances, the "possibility of confusion" occasioned by an instructional error may be "diminished by the parties' closing arguments." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192.) Here, however, while the prosecutor called the offense "transportation for sale," her commentary on the transportation element, if anything, compounded the instructional error. She never told the jury the transportation must be for the purpose of sale. Instead, she conveyed the *crucial* point about transportation was it could be over any distance, no matter how small: "Any short distance whatsoever is sufficient. Any movement. [¶] . . . [¶] So the fact that [McCloud] was in the vehicle driving with that on the passenger seat constitutes transportation." Far from correcting the instructional error, this commentary emphasized the pre-amendment version of the statute, where any movement, for any purpose, was sufficient to constitute a violation.

Given the state of the evidence on intent to sell, we hold McCloud was prejudiced by the incomplete instruction and reverse his transportation for sale conviction.

B. *Admissibility of the Evidence Supporting Possession for Sale*

Next, McCloud argues the trial court erroneously admitted the evidence found during the 2012 search because the police lacked a warrant to search his bedroom and cell phone. We find no error.

1. *McCloud's Suppression Motion*

Two members of the gang task force who performed the search testified at the hearing on McCloud's motion to suppress. The district attorney investigator said the

18

search team arrived in a five-car convoy to R.F.'s residence around 8:30 p.m. The residence was a two-story house located in the Eastside, which according to the investigator, is a neighborhood of Riverside known to have two predominant gangs, heavy violence, drug sales, and prostitution. The investigator noticed McCloud standing next to a car in the driveway as they approached. When McCloud saw the police cars he "panicked, and then ran" into the house. The investigator and another officer walked over to the side of the house and heard what sounded like someone stepping on aluminum cans on the upstairs balcony. The officer shined his flashlight on the balcony and reported that he saw someone with black curly hair—a description that did not match McCloud—retreat inside. At trial, Antonio said he was the person on the balcony.

The sheriff's deputy, who rode in the fourth car in the convoy, said when he reached the house two officers told him McCloud had just run inside and the front porch light had gone off. Both the investigator and deputy thought McCloud's behavior was suspicious.

The house manager happened to be on a bicycle near the front door, and the deputy asked him if he knew the name of the man who had just run from them. The manager identified McCloud, said his room was at the end of the hallway on the second floor, and gave the deputy the key to the front door. The residence appeared to be a single-family home, and only after the search did the deputy learn it contained seven separately rented rooms.

19

The front door opened into a staircase, so the only option was to go upstairs. The deputy announced his presence and walked into the second-floor kitchen, where four men appeared to be playing dominoes. Three of these men said they were on probation. While the deputy remained in the kitchen, the other officers performed a protective sweep of the house, ordering anyone who was inside a room to come into the hallway.

From his vantage point, the deputy could see the door to McCloud's room. The door was closed and there was what appeared to be clothing and a cell phone lying on the floor next to it. In response to the officers' commands, Antonio came out of the room, leaving the door open behind him. After a few more commands, McCloud flushed the toilet and emerged from a bathroom directly across the hallway. The officers continued the sweep after McCloud and Antonio complied with the order to lie down, at which point they found the cocaine, paraphernalia, and cash in plain view in McCloud's room.

The deputy told McCloud they wanted to search his room and his car based on the contraband they found in his room, and McCloud signed a consent form allowing the police to search both areas. It was during the more thorough search of his bedroom that the officers found the gun under the mattress. The officers also searched the phone lying outside the room to see whom it belonged to, and in doing so found the drug-related text messages.

McCloud's counsel argued the search of his room was unlawful because once the officers learned it belonged to someone other than the probationer they were there to search, they should have sought a warrant. He also argued the search of McCloud's cell

20

phone was unlawful following the United States Supreme Court's decision in *Riley v. California* (2014) 573 U.S. ___ [134 S.Ct. 2473] (*Riley*), which requires police to obtain a warrant before exploring the contents of a cell phone. He asked the court to exclude the text messages, drugs, paraphernalia, and gun from evidence.

The court denied the motion, finding the protective sweep lawful and McCloud's subsequent consent valid. The court declined to rule on the *Riley* issue and told McCloud he could bring an in limine motion before or during trial. On the first day of trial, the court denied McCloud's renewed suppression motion on the ground the good faith exception to the exclusionary rule applied, as the search had taken place before *Riley* when California law allowed warrantless searches of cell phones incident to arrest.

2.    *Analysis*

When reviewing a ruling on a suppression motion, we defer to the trial court's factual findings, if supported by substantial evidence, and independently determine the constitutional significance of those findings. (*People v. Suff* (2014) 58 Cal.4th 1013, 1053.) "'The Fourth Amendment to the federal Constitution prohibits *unreasonable* searches and seizures.'" (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1212 (*Macabeo*).) In the absence of a warrant, it is the People's burden to show an exception applies. (*Id.* at p. 1213.)

One such exception is a "protective sweep"—a cursory visual inspection of those places in which a person might be hiding, designed to ensure officer safety. (*Maryland v. Buie* (1990) 494 U.S. 325, 327.) Like a *Terry* stop and frisk (*Terry v. Ohio* (1968) 392

21

U.S. 1) and the preventative search of an automobile for weapons during a roadside encounter (*Michigan v. Long* (1983) 463 U.S. 1032), a protective sweep can be justified even though an officer lacks both a warrant and probable cause to believe his or her safety is threatened. (*People v. Ledesma* (2003) 106 Cal.App.4th 857, 863 (*Ledesma*).) The standard is "reasonable suspicion": "[T]here must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." (*Maryland v. Buie*, at p. 334; *People v. Celis* (2004) 33 Cal.4th 667, 678 (*Celis*) ["A protective sweep can be justified merely by a *reasonable suspicion* that the area to be swept harbors a dangerous person"].)

Officers may conduct protective sweeps while making a valid arrest or conducting a valid probation search. (*People v. Werner* (2012) 207 Cal.App.4th 1195, 1206, citing *Ledesma*, *supra*, 106 Cal.App.4th at p. 864.) The rationale behind a protective sweep is obvious—"[w]hen conducting a search or an arrest in a home, police officers face the potential danger posed by unknown persons located inside." (*Ledesma*, at p. 860.)

*Ledesma*, where the court held a protective sweep "may properly *precede* a probation search," is instructive. (*Ledesma*, *supra*, 106 Cal.App.4th at p. 864, italics added.) There, like here, "the officers discovered a substantial quantity of money and controlled substances in a bedroom they would have been unable to enter during the probation search." (*Id*. at p. 860.) Also like here, the defendant "was not the subject of

22

the probation search, but occupied the bedroom where the money and drugs were found." (*Ibid.*)

In that case, there were two cars and a trailer parked out front when the police arrived at the probationer's address. (*Ledesma*, *supra*, 106 Cal.App.4th at p. 861.) The defendant answered the door and seemed to be under the influence of drugs. He told the officers the probationer had not been there in a while, but let them inside to search the room where she sometimes stayed. (*Ibid.*) Before searching her room, one of the officers told the defendant he was going to perform a protective sweep to "make sure nobody was going to sneak up behind [them] while [they] had [their] heads buried in a dresser drawer looking for items within [her] probation terms." (*Ibid.*)

As the officers swept through the defendant's room, they saw him stash what appeared to be methamphetamine into one of his dresser drawers. (*Ledesma*, *supra*, 106 Cal.App.4th at p. 861.) After admitting the substance was methamphetamine, the defendant consented to a more thorough search of his bedroom, during which the officers found "more than an ounce of controlled substance and other evidence suggestive of drug trafficking." (*Id.* at p. 862.)

The *Ledesma* court concluded the protective sweep of the defendant's bedroom *before* the search of probationer's bedroom was lawful because the "totality of the circumstances" leading up to the sweep supported a reasonable suspicion the residence contained dangerous individuals. (*Ledesma*, *supra*, 106 Cal.App.4th at pp. 863-865.) The court based this conclusion on the fact the police were about to perform a potentially

23

lengthy probation search—which would involve "a careful examination of all the nooks and crannies of a probationer's bedroom"—while "on their 'adversary's "turf."'" (*Id.* at p. 864.) Additionally, the probationer was a convicted drug user and the defendant appeared to be under the influence of drugs. These facts would justify a reasonably well-trained officer to suspect "the residence was the site of ongoing narcotics activity." (*Id.* at p. 865.) Finally, that there were two cars and a trailer parked sufficiently close to the residence created "a reasonable possibility that former occupants of the vehicles might be inside." (*Id.* at p. 866.)

While the facts of *Ledesma* are similar to ours, we view the testimony at McCloud's suppression hearing as even stronger support for a protective sweep. In *Ledesma*, the officers encountered only one person inside the home, but the fact there were multiple cars out front made it reasonable to suspect there might be others inside. Here, in contrast, the officers knew there were *at least* six people inside the home, in various places—McCloud, Antonio, and the four men in the kitchen. This large number of occupants was reason enough for the officers to worry about their safety and want to ascertain who was in the house before doing anything else.

Add to this McCloud's behavior when the officers approached the house as well as the neighborhood's reputation for gang activity, crime, and violence, and the decision to perform a protective sweep appears even more justified. The officers did not know who or what they would find when they entered the home. Indeed, what initially appeared to be a single-family dwelling turned out to be a residence with multiple bedrooms rented

24

out separately. And, when the officers saw McCloud dart inside the house and turn off the porch light, they could reasonably suspect he wanted to give the impression no one was home while warning the inhabitants (who could be dangerous) of the presence of law enforcement. Then, when it became apparent McCloud was not among those playing dominoes or otherwise accounted for, the officers could at that point reasonably suspect he had run inside to arm himself and hide.

In short, the police arrived at the residence looking for probationer R.F. but what they instead found was a house full of at least six people, one of whom had already exhibited suspicious behavior. Based on McCloud's furtive actions, the number of people in the house, and the neighborhood in which the house was located, we conclude the police were justified in worrying there could be others hiding or posing a danger to their safety. As a result, the officers could not feel safe in diverting their attention to a detailed probation search without first determining how many people were inside the home. (*Ledesma*, *supra*, 106 Cal.App.4th at p. 864 [it is reasonable to conduct a protective sweep before examining the "nooks and crannies" of a probationer's living quarters when in adversary territory].)

Acknowledging that California appellate courts have extended protective sweeps based on reasonable suspicion to probation searches, McCloud argues the rule is nevertheless a dubious one because the California Supreme Court declined to reach the issue in *Celis*. McCloud is wrong; the protective sweep issue in *Celis* had nothing to do with a probation search. Rather, the court assumed without deciding that the lower

reasonable suspicion standard—as opposed to the higher probable cause standard—applied when police conducted a protective sweep of a home after detaining, *rather than arresting*, a suspect outside the home. (*Celis*, *supra*, 33 Cal.4th at pp. 678-680 [concluding the facts failed to satisfy even the reasonable suspicion standard].) Our high court has not questioned *Ledesma's* holding that the reasonable suspicion standard applies to a protective sweep incident to a valid probation search, and *Ledesma* remains good law. (See, e.g., *People v. Werner*, *supra*, 207 Cal.App.4th at p. 1206 [approving and following *Ledesma*].)

Next, McCloud argues the sweep of his bedroom was unlawful because it occurred after he and his cousin had already emerged and thus it was "clear that the bedroom did not harbor any other potentially dangerous persons." Not so. Just because two individuals had complied with the officers' orders, it was by no means certain there were not others still hiding. The officers were justified in suspecting there could be more people inside any of the rooms of the house, and the only way to be sure was to sweep through them.

We conclude the drugs, paraphernalia, and cash found in plain view were not the fruits of an unlawful search and the trial court was right not to exclude them from evidence. The gun was found after McCloud gave the officers written consent to more fully search his room, so it also was admissible. (*People v. Panah* (2005) 35 Cal.4th 395, 466 [valid consent is an exception to the warrant requirement].)

26

We now turn to the text messages on McCloud's cell phone, which, he argues, should have been suppressed because the officers did not have a warrant to search the phone, as required under the United States Supreme Court's 2014 *Riley* decision. (*Riley*, *supra*, 573 U.S. at p. __ [134 S.Ct. at p. 2489] [holding officers must generally obtain a warrant before searching data on a suspect's cellular phone, even when the phone is seized incident to arrest].) Had the search of McCloud's cell phone occurred after the Supreme Court decided *Riley*, we would agree. However, *People v. Diaz* (2011) 51 Cal.4th 84 (*Diaz*), which held a cell phone "immediately associated" with an arrestee could be searched incident to arrest, was binding appellate precedent at the time of the search, and the officers in good faith relied on it.

The good faith exception to the exclusionary rule applies to "searches conducted in objectively reasonable reliance on binding appellate precedent." (*Davis v. U.S.* (2011) 564 U.S. 229, 232.) The rationale behind this exception is that when police "conduct a search in compliance with binding precedent that is later overruled," suppression "do[es] nothing to deter police misconduct" and "come[s] at a high cost to both the truth and the public safety." (*Ibid.*) Stated differently, "the law enforcement officer may not be penalized for the appellate judges' error." (*People v. Youn* (2014) 229 Cal.App.4th 571, 579.)

The California Supreme Court recently considered the applicability of the good faith exception in this specific context in *Macabeo*, where an officer found images of underage girls in defendant's cell phone after detaining him for bicycling through a stop

27

sign—an infraction that could not support an arrest. (*Macabeo*, *supra*, 1 Cal.5th at pp. 1210-1212.) Our high court acknowledged the phone search could not be justified as "incident to arrest" under *Riley*. (*Macabeo*, at p. 1216.) But it also concluded the search would not have been justified under *Diaz* either, as a reasonably well-trained officer would know California law prohibited arrest for the cycling infraction. (*Macabeo*, at pp. 1223-1224.) Because the search did not satisfy the binding appellate precedent at the time, the court refused to apply the good faith exception. (*Id.* at pp. 1223-1226.)

Here, in contrast, the search of McCloud's phone *did* satisfy *Diaz*. The phone was immediately associated with McCloud because it lay on the floor near him and his bedroom, and the search occurred after the police had probable cause to arrest him based on the contraband in his bedroom.

McCloud argues the good faith exception does not apply to warrantless cell phone searches as a matter of law because the Supreme Court did not apply the exception to justify the search in *Riley*. McCloud reads too much into this fact. We do not know why the Supreme Court did not discuss the good faith exception in *Riley*, perhaps the parties simply did not raise it. In any event, neither the United States Supreme Court nor the California Supreme Court has held the good faith exception can never apply to warrantless cell phone searches. Our high court had occasion to make that categorical ruling in *Macabeo*, but did not. Instead, it analyzed the search under the good faith exception and held the search did not qualify *on the merits*. (*Macabeo*, *supra*, 1 Cal.5th

at pp. 1223-1226.) We engage in the same analysis here and conclude the search does qualify.

We also reject McCloud's contention the good faith exception does not apply because the prosecution presented no evidence the officers considered or even knew of *Diaz* at the time of the search. McCloud incorrectly assumes the good-faith standard is subjective. "[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal." (*Macabeo*, *supra*, 1 Cal.5th at p. 1222.) Here, we have no trouble concluding a reasonably well-trained officer would be aware of an important California Supreme Court decision on searches incident to arrest.

C.      *The Clerical Error in the Super Strike Allegations*

McCloud argues the trial court violated his due process rights by permitting the prosecution to *amend* the most current accusatory pleading to allege *different* prior offenses after the jury had returned its verdict and been discharged. McCloud mischaracterizes the record. In actuality, the trial court simply allowed the prosecution to correct an obvious clerical error.

In the most current information, the prosecution inadvertently cited Penal Code section 245, *subdivision (a)(3)* (assault with a machine gun on *any person*) as the prior super strike offense instead of Penal Code section 245, *subdivision (d)(3)* (assault with a machine gun on a *peace officer*). Despite the citation error, the information correctly described the offense as assault with a machine gun *on an officer*. Additionally, the

29

earlier accusatory pleadings had cited the correct statutory subdivision.  Defense counsel

agreed the error was clerical and admitted he was aware of it before trial.  On this record,

McCloud's claim of due process violation is meritless.

        1.     *Additional background*

The prosecution filed the initial complaint for the September 2012 incident in

November 2012, and in it alleged McCloud had suffered two prior strike convictions for

assault with a machine gun on a peace officer in violation of Penal Code section 245,

*subdivision (d)(3)*.  A few months later, the prosecution filed a complaint for the February

2013 incident, which alleged three prior strike convictions for assault with a machine gun

on a peace officer in violation of Penal Code section 245, *subdivision (d)(3)*.  After the

two cases were consolidated, the prosecution filed an amended information changing the

date of the three prior strike assault convictions from June 1994 to May 1994.[3]  The

amended information also cited Penal Code section 245, *subdivision (d)(3)* as the offense.

About two years later and just before trial, the prosecution filed a second amended

information in the consolidated case.  This time, the prosecution mistakenly cited to

Penal Code section 245, *subdivision (a)(3)* for the three prior strikes.  However, the

description of the offense remained the same as in the prior pleadings—assault with a

machine gun on an officer.

McCloud waived his right to trial on the alleged priors and, after the jury rendered

its verdict, he admitted the prior allegations as alleged in the second amended

---

[3] The assaults arose from one incident involving three officers.

30

information.  For his three prior assault convictions, he admitted he was "convicted of the crime of *assault with a machine gun on an officer*, in violation of section 245, *subdivision (a), subsection (3)* of the Penal Code."  (Italics added.)  In other words, he admitted to the correct offense with the incorrect Penal Code subdivision.

At the sentencing hearing, the prosecution informed the court it had made a clerical error in the second amended information and asked for permission to correct it.  Defense counsel opposed correction because it would change the prior strikes (for machine gun assault on any person) to super strikes (for machine gun assault on a peace officer), thereby increasing McCloud's exposure from a 15-year determinate term to 25 years to life.[4]  He added, "I knew this wasn't properly filed.  [But it's] not my duty to inform the DA's office when they make a mistake like that to benefit my client."  The court asked the parties to brief the issue and continued sentencing.

At the hearing on the prosecution's written motion, defense counsel explained he had not filed opposition papers because the motion was "on good grounds," adding, "There really isn't anything I can do in terms of opposing it."  However, he believed correcting the clerical error would violate McCloud's due process because, even though he "knew [the filing] was wrong," he "may have" changed his trial strategy for the 2012 incident had the prosecution cited the correct statutory subdivision.  Specifically, he

---

[4] Assault with a machine gun on a peace officer constitutes a serious and/or violent felony—what is commonly referred to as a "super strike."  (Pen. Code, § 1170.12, subd. (c)(2)(C)(iv).)  Under Penal Code section 1170.12, subdivision (c)(2)(A), a defendant who has suffered more than two super strikes is subject to an alternative sentence of 25 years to life.

31

might have transferred his focus from establishing the gun did not belong to McCloud to establishing the drugs did not belong to him.

The court granted the prosecutor's motion. It rejected the due process argument and found McCloud and his counsel had been on notice of the alleged prior assaults by virtue of the language describing the offenses as well as the previous pleadings citing the correct statutory subdivision. The court vacated McCloud's admissions on his priors and allowed the People to present evidence of his prior assaults to "clarify the record." The prosecution introduced the abstract of judgment reflecting McCloud had pled guilty to three counts of assault with a machine gun on a peace officer May 4, 1994 in violation of Penal Code section 245, subdivision (d)(3), and the court found the allegations true.

2.      *Discussion*

Due process requires a defendant receive notice of the charges against him and the opportunity to defend against them. (*People v. Jones* (1990) 51 Cal.3d 294, 317.) Penal Code section 1170.1, subdivision (e) states "[a]ll enhancements shall be *alleged* in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact." (Italics added.) Penal Code section 952 provides, "[i]n charging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified. Such statement . . . may be in the *words of the enactment describing the offense* or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused." (Italics added.)

The accusatory pleading "need not specify by number the statute under which the accused is being charged." (*People v. Thomas* (1987) 43 Cal.3d 818, 826.) "More importantly, 'even a reference to the wrong statute has been viewed of no consequence under the circumstances there appearing.'" (*Ibid.,* citing *People v. Schueren* (1973) 10 Cal.3d 553, 558.) In other words, it is the factual allegations of a pleading that determine what offenses or enhancements have been charged, *not the statute number.* (*People v. Shoaff* (1993) 16 Cal.App.4th 1112, 1118, citing *People v. Hernandez* (1988) 46 Cal.3d 194, 208.)

In *People v. Siegel* (1961) 198 Cal.App.2d 676, the defendant was charged with "attempted escape" under Penal Code section 664—the general attempt section—instead of under Penal Code section 4532, subdivision (b)—which more specifically sets forth the crime of attempted escape and provides specific punishments. On appeal, the defendant argued the prosecution's failure to specify the correct statutory section was fatal and required reversal. The *Siegel* court found "[t]he mistake in the number of the [Penal Code] section . . . unimportant." (*People v. Siegel*, at pp. 683-684.) The defendant suffered no prejudice because the pleading's "*charging language . . . is exactly that which would support a charge under* [Penal Code] section 4532, subdivision (b)," and as a result, he "was fully apprised of the offense of which he was being tried." (*Id.* at pp. 683-684.)

Similarly, in *People v. Rivers* (1961) 188 Cal.App.2d 189, the defendant was charged with sale of narcotics, but the accusatory pleading set forth the wrong Health and

33

Safety Code section. The court concluded the error was harmless because "[t]he purpose of the requirement of certainty in an indictment or information is to apprise the accused of the charges against him so that he may adequately prepare for his defense" and it was "clear from the language of the information . . . that the defendant knew he was being charged with the sale of narcotics." (*Id.* at p. 195.) In short, "the defect was merely one of artificiality rather than substance." (*Ibid.*)

Under this clear authority, McCloud's due process argument cannot stand. The pleading defect here is even more inconsequential than those in *Siegel* and *Rivers*. Not only did the pleading language put McCloud on notice he would have to defend against allegations of prior convictions for assault with a machine gun on *peace officers*, but also the prior pleadings cited the *correct statutory subdivision* for those convictions. McCloud was equipped with everything he needed to discern the charges against him— he had both the language of the offense (from the current pleading) and the correct statutory subdivision (from the previous pleadings). The former alone would have been enough to satisfy due process.

McCloud renews the argument that his counsel would have pursued a different trial strategy had the prosecution not made the error. We are unmoved. The statutes and case law are clear that the description of the offense controls, not the statute number. As a result, counsel's decision to base trial strategy on a statutory citation he knew to be erroneous was a gamble he took at his own risk.

Finally, McCloud is incorrect that this case is at odds with *People v. Tindall* (2000) 24 Cal.4th 767, where the court held the prosecution cannot amend the accusatory pleading to add previously unalleged prior convictions once the jury has been discharged. (*Id.* at p. 782.) Unlike in *Tindall*, the prosecution here did not attempt to allege *new* prior convictions, thereby surprising McCloud and depriving him of the right to elect to have the same jury decide his charges and priors. (*Id.* at p. 770 [acknowledging Pen. Code, § 1025 gives criminal defendants the right to have the same jury decide charges and prior allegations].) This was a case of a minor pleading defect, not an eleventh-hour augmentation.

## III

## DISPOSITION

We reverse the judgment as to transportation for sale and affirm in all other respects. We remand the case to the trial court for resentencing or retrial on transportation for sale at the option of the prosecuting attorney. (See *Mil*, *supra*, 53 Cal.4th at pp. 419-420.)

CERTIFIED FOR PARTIAL PUBLICATION

SLOUGH          

J.

We concur:

MILLER         
      Acting P. J.

CODRINGTON     
      J.